Exhibit B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

```
KSENIIA PETROVA,                       )        CIVIL ACTION NO.
              Petitioner,              )        2:25-cv-00240-cr
                                       )
         v.                            )
                                       )
U.S. DEPARTMENT OF HOMELAND            )
SECURITY, et al.,                      )
              Respondents.
```

BAIL HEARING
Wednesday, May 28, 2025
Burlington, Vermont

BEFORE:

    THE HONORABLE CHRISTINA C. REISS,
    Chief District Judge

APPEARANCES:

GREGORY ROMANOVSKY, ESQ., Romanovsky Law Offices, 12 Marshall
    Street, Boston, MA 02108, Counsel for the Petitioner

JEFFREY M. HARTMAN, ESQ., U.S. Department of Justice, Civil
    Division, Office of Immigration Litigation, General
    Litigation and Appeals Section, P. O. Box 868, Ben
    Franklin Station, Washington, D.C. 20044, Counsel for the
    Respondents

Johanna Massé, RMR, CRR
Official Court Reporter
P. O. Box 5852
Burlington, VT 05402
802-951-8102 | 802transcripts@gmail.com

INDEX TO EXAMINATIONS

WITNESS                                                         PAGE

MICHAEL D. WEST, Ph.D.
        Direct by Mr. Romanovsky                                   9
        Cross by Mr. Hartman                                      18

CORA E. ANDERSON
        Direct by Mr. Romanovsky                                  19

MARIA DAIKOVA
        Direct by Mr. Romanovsky                                  25
        Cross by Mr. Hartman                                      28

MARC W. KIRSCHNER, Ph.D.
        Direct by Mr. Romanovsky                                  29


INDEX TO EXHIBITS

PETITIONER

| EXHIBIT | DESCRIPTION | I.D. | RECEIVED |
|---|---|---|---|
| A | Declaration of Peter A. Quinter | 36 | 36 |
| B | Declaration of Andrea Nicole Wilson | 36 | 36 |
| C | 5/1/25 Letter from Martin Chalfie, Ph.D. | 36 | 36 |
| D | Copy of Canceled Visa | 36 | 36 |
| E | Copy of Schengen Visa | 36 | 36 |
| F | 4/10/25 FOIA Request | 36 | 36 |
| G | District of Massachusetts Criminal Complaint | 36 | 36 |
| H | 5/14/25 Memo to Hon. Kayla McClusky from USPO Kristin Vidrine | 36 | 36 |
| I | Government's Motion to Seal District of Massachusetts Complaint | 36 | 36 |
| J | 4/22/25 Letter to Secretary Noem and Acting Director Lyons from Massachusetts Members of Congress | 36 | 36 |

1  Wednesday, May 28, 2025

2      (The following was held in open court at 10:05 AM.)

3          COURTROOM DEPUTY:  Your Honor, this is civil case

4  number 25-240, Kseniia Petrova v. United States Department of

5  Homeland Security, Kristi Noem, and Theresa Messier.

6  Representing the respondents is Attorney Jeffrey Hartman.

7  Representing the petitioner is Attorney Gregory Romanovsky.

8  The petitioner is present via video.  Also present is Russian

9  interpreter Naira Hapopian.

10      The matter before the Court is a bail hearing.

11          THE COURT:  Good morning.  I want to let you know how

12  we're going to proceed today so you can arrange yourself

13  accordingly.  The first thing I'm going to do is review the

14  motion for leave to amend.

15      Where is that feedback coming from?  Yeah.  Somebody's

16  pointing to the microphone or the amplifier, but I think

17  that -- we don't have an interpreter, correct?

18          COURTROOM DEPUTY:  We do.

19          THE COURT:  We do.  Okay.  That's what I'm hearing.

20  All right.

21      So I'm going to rule on the motion for leave to amend,

22  we're going to take up our witnesses and have that portion

23  completed, I'm going to hear your arguments, and then I'm going

24  to rule on the pending bail request.

25      So with regard to the motion for leave to amend, it's been

1 fully briefed, and Ms. Petrova asserts that the facts have

2 changed significantly since she filed her initial petition.

3 When she filed it, she hadn't received a completed order

4 regarding her removal.  She was uncertain of the grounds for

5 her detention.

6          COURTROOM DEPUTY:  Judge Reiss?

7          THE COURT:  Yes.

8          COURTROOM DEPUTY:  The interpreter needs time to

9 interpret.

10          THE COURT:  Okay.  You're interpreting from there?

11          THE INTERPRETER:  Yeah.  I'm -- I'm interpreting for

12 Kseniia --

13          THE COURT:  Okay.  That's --

14          THE INTERPRETER:  -- but it's echoing.  Is that okay?

15          THE COURT:  All right.  Now I understand.  I'm sorry.

16 I didn't look in your direction.  Typically we have the

17 interpreter with the person --

18          THE INTERPRETER:  Right.

19          THE COURT:  -- and you and she are on headsets so it's

20 not interfering with the Court's proceeding.  I'll start over

21 again, and you tell me --

22          THE INTERPRETER:  If you have a headset, I'm happy to

23 take the headset so it's not echoing so loud.

24          THE COURT:  Yes.  But I don't know if you're going to

25 be able to communicate with her through that headset.  It would

 1 | need to have to have been set up in advance.
 2 |     Mr. Romanovsky?
 3 |         MR. ROMANOVSKY:  Your Honor, if I may, we're willing
 4 | to waive the interpretation for purposes of today's hearing
 5 | given the logistical challenges.
 6 |         THE COURT:  Okay.  Ms. Petrova, can you understand me?
 7 |         THE PETITIONER:  Yes.
 8 |         THE COURT:  Would you feel comfortable interrupting me
 9 | if you can't understand?
10 |         THE PETITIONER:  Okay.
11 |         THE COURT:  All right.  I give you my permission to do
12 | that.  Okay?
13 |         THE PETITIONER:  Okay.
14 |         THE COURT:  All right.  And I'm sorry.  We usually
15 | have the person in the room, and I expected if you were going
16 | to have an interpreter that's what would happen.  Otherwise, I
17 | don't think the attorneys can hear me while you are
18 | interpreting through a microphone.  I'm sorry about that.
19 |     So I'm going to start over again.
20 |     I'm going to rule on the motion for leave to amend because
21 | that's going to shape the Court's jurisdiction and the claims
22 | before the Court.
23 |     And Ms. Petrova has alleged that the facts have changed
24 | significantly since she filed her petition and that when she
25 | filed it she didn't even have a completed order of removal or

1  the grounds for her detention.  She claims that because the

2  government has chosen to criminally prosecute her, which she

3  claims is an effort to deprive this court of habeas

4  jurisdiction, she should be allowed to amend her petition to

5  reflect this change in circumstances.

6       The government counters that leave to amend should be

7  denied because of unexcused delay in seeking leave to amend.

8  It further argues that many of Ms. Petrova's claims are futile,

9  the Court lacks jurisdiction for them, and to grant her leave

10 to amend would be an exercise in futility.

11      In this case, the Court finds no undue delay.  Ms. Petrova

12 moved to amend her petition shortly after the Court's last

13 hearing.  The facts have been in flux and have changed

14 substantially.  We have a much clearer understanding as to what

15 happened at Logan Airport and the grounds for her detention and

16 her removal proceedings.  She is now affirmatively asking for

17 release from detention.

18      The government did not alert the Court at its last hearing

19 that it intended to prosecute Ms. Petrova criminally.  Had it

20 done so, the Court could have factored that into its analysis.

21 I don't understand why the criminal complaint and the arrest

22 warrant were sealed.  She was in ICE custody.  They could have

23 effected the arrest without it.  I consider that not my issue,

24 but I don't see that the government couldn't have let the Court

25 know that it was going to move in the direction of a criminal

1  prosecution.

2      Since the Court's -- since the petition was filed, the

3  Second Circuit has ruled in two cases, the *Ozturk* case and

4  *Mahdawi* case.  They clarified the scope of habeas jurisdiction,

5  when a bail hearing can be held, when bail can be granted.  Of

6  course, that was also set forth in *Mapp v. Reno*.  So on that

7  basis, because there's no undue delay and because the facts and

8  circumstances have changed significantly since she filed her

9  initial petition, the Court hereby grants Ms. Petrova leave to

10  amend her petition.

11      In doing so, it does not dismiss the government's

12  arguments that the claims are futile or the Court lacks

13  jurisdiction.  For example, I agree with the government that

14  there does not appear to be any basis for habeas corpus

15  jurisdiction for a Freedom of Information claim.  I want to see

16  case law that says that before I consider that.  That seems to

17  be quite outside the bounds of habeas jurisdiction.

18      When there's a pending motion to dismiss and somebody

19  amends their petition, just like an amended complaint, the

20  Court has two options:  I could dismiss the motion to dismiss

21  or deny it as moot and say refile, or I could take your motion

22  to dismiss, apply it to the new petition, allow you to

23  supplement your arguments to reflect the new arguments, give

24  you an opportunity to respond.

25      That's what I'm going to do in this case.  I'm going to

1 grant the government 14 days to supplement its motion to

2 dismiss, and I'm going to grant Ms. Petrova 14 days to respond

3 to that.  If the parties need more time, just let me know.

4      So for this purposes, we have an amended petition for

5 habeas corpus, and now I'm going to proceed with witness

6 testimony.  And my understanding is the petitioner has

7 witnesses, the government does not.

8      Do I have that right?

9           MR. ROMANOVSKY:  Yes, Your Honor.

10           MR. HARTMAN:  Yes, Your Honor.

11           THE COURT:  Okay.  So you may call your first witness.

12           MR. ROMANOVSKY:  Thank you, Your Honor.

13      Would you like me to be at the podium or --

14           THE COURT:  Wherever you're most comfortable.  But in

15 our district, you stand when you question the witnesses.  And I

16 would take your live witnesses first, but I'll let you do it in

17 any order you want to do it.

18           MR. ROMANOVSKY:  You would like the live witnesses

19 first?

20           THE COURT:  Any order that you would like to do it.

21 Go ahead.

22           MR. ROMANOVSKY:  We would like to call Michael West,

23 who's on Zoom, Your Honor, first, if possible.

24           THE COURT:  You may do so.

25           MR. ROMANOVSKY:  Thank you.

Michael D. West, Ph.D. - Direct

1          COURTROOM DEPUTY:  Give me a moment to unmute him.

2      Good morning.  Is this Michael West?

3          THE WITNESS:  Yes, it is.

4          THE COURT:  Let's have the witness sworn and placed on

5  Zoom, please.

6          COURTROOM DEPUTY:  Mr. West, can you start your video.

7          THE WITNESS:  It requires you to activate it.  It's

8  currently disabled by the host.

9          THE COURT:  All right.  So we have him on video.

10 Let's have him sworn, please.

11         COURTROOM DEPUTY:  Mr. West, please raise your right

12 hand.

13                    MICHAEL D. WEST, Ph.D.,

14      having been first duly sworn by the courtroom deputy,

15             was examined and testified as follows:

16         THE WITNESS:  Yes, I do.

17         THE COURT:  Go ahead.

18                    DIRECT EXAMINATION

19 BY MR. ROMANOVSKY:

20 Q    Good morning, Mr. West.  Can you please state your full

21 name for the record.

22 A    Michael David West, W-E-S-T.

23 Q    Mr. West, what do you do for a living?

24 A    Well, I'm a scientist and entrepreneur in the

25 biotechnology industry for the most part.

Michael D. West, Ph.D. - Direct

1  Q    And could you describe your education and experience in

2  the industry.

3  A    Sure.  I received my Ph.D. from Baylor College of Medicine

4  in -- in Houston, Texas, from the Division of Molecular

5  Virology, and I post -- I did postdoctoral work at the

6  University of Texas Southwestern Medical Center at Dallas.  And

7  then I went directly into the biotech industry as an

8  entrepreneur and made inventions and started biotech companies,

9  five public companies, and mostly in the field of developmental

10  biology, aging, and regenerative medicine.

11  Q    And what do you see as your most important accomplishments

12  in the field?

13  A    Well, I'm proud of the fact that I can say that I'm really

14  the father of this field we call regenerative medicine.  So in

15  my first company, I collaborated with some very high-quality

16  scientists, three of which -- well, one was a Nobel Prize

17  winner, James Watson, who discovered the structure of DNA, and

18  two that won the Nobel Prize in part because of our

19  collaborative work, Dr. Carol Greider and Liz Blackburn, for

20  the work that we did in my first company relating to the

21  biology of cellular aging, something we call telomere biology.

22      Also in my first company, I initiated this field we call

23  regenerative medicine, which is -- came from the study of early

24  development, embryonic development, and so I was the one who

25  organized the first isolation of human embryonic stem cells,

Michael D. West, Ph.D. - Direct

1  which was very much in the news back in the administration of

2  George W. Bush.  His first national address was -- was on this

3  project that I initiated.

4        And in the years subsequent to that, I worked in applying

5  this technology through various avenues for the problems of

6  chronic, age-related, degenerative disease, of which now

7  there's been over a thousand patients treated with therapies

8  that came originally from that research.

9  Q    Mr. West, do you know Kseniia Petrova personally?

10 A    No, I do not.

11 Q    Why did you decide to testify today?

12 A    Well, I read the news reports, and I felt that there must

13 be some kind of misunderstanding here.  It went against

14 everything I understand about developmental biology, which is

15 considerable, having authored numerous books in the field, and

16 the -- the samples that I heard described were -- would be

17 entirely inert materials, nonhazardous in nature and nontoxic,

18 nonliving, and -- and, secondly, of no apparent commercial

19 value.

20      I've commercialized research products, so I have a sense

21 of the value, and I felt that there must be a misunderstanding,

22 and so I reached out to you as Ms. Petrova's attorney to see if

23 I could get in touch with these collaborators in France to see

24 if there was something I didn't understand about it, and that

25 was the initiation of my --

Michael D. West, Ph.D. - Direct

1  Q    Did you -- I apologize for interrupting.

2       And did you in fact reach out to the collaborators in

3  France?

4  A    Yes, I did.

5  Q    What did you learn?

6  A    Well, what I learned was, as I suspected and as -- as you

7  would expect from the nature of these experiments that were

8  under way between Harvard and Institut Curie, were that these

9  were fertilized frog eggs that had been rendered inert - by

10 "inert" I mean nonliving - through a series of chemical

11 treatments.  So they were formalin fixed.

12      As you may know, formaldehyde -- formalin is a version of

13 formaldehyde.  It's a treatment that kills everything.  So

14 again, I have formal training in virology and epidemiology.  It

15 kills all known viruses, for instance.  But it would also kill

16 any bacteria, any fungus, mold.  It would even kill bacterial

17 spores, which are relatively resistant to being killed.  So I

18 provided in my written declaration an example of a published

19 paper that shows that this treatment even destroys bacterial

20 spores.

21      So these samples were rendered as inert as -- I think I

22 mentioned in the written declaration it would be -- to put

23 simply, it would be like shoe leather is not alive.  It once

24 had a biological origin, but the process of tanning -- or

25 making paper from a tree.  You know, paper's not alive.

Michael D. West, Ph.D. - Direct

1      This process of formalin fixation transforms living
2  material to protein and nucleic acids that can be used for
3  scientific study.  So consistent with that, these samples were
4  embedded in wax, paraffin wax, as is common procedure, after
5  formalin fixation and then a series of dehydration steps
6  through using alcohol, were embedded in this wax so that they
7  could be sliced with what's called a microtome and then put on
8  a slide and then studied under a microscope.  Some of them were
9  prepared on slides and were in a separate container, as I
10  understand, and were -- they hoped to keep them cool because
11  they were going to study the expression of genes in this
12  protein on the slide.  And some were simply left in paraffin
13  and put in vials so that at Harvard Medical School they could
14  make their own slices or sections of these as well and put them
15  on slides.
16  Q    Thank you, Mr. West.
17      You mentioned that you have collaborated with several
18  Nobel Prize laureates, if I understood you correctly.  Can you
19  describe this collaboration a little more for us.
20  A    Well, the -- sure.  There are -- there are trends in the
21  history of medicine that -- where some very high-quality work
22  is done and sometimes in the very early stages of development
23  that, you know, some bright minds recognize the trends early
24  on, and the work we began years ago at my first company, Geron,
25  James Watson, the Nobel laureate I mentioned earlier, I was

Michael D. West, Ph.D. - Direct

1  meeting with him and he -- he believed passionately that where

2  this field was heading - we had discussions about this some

3  years ago now - was extremely important, and so his

4  institution, Cold Spring Harbor Laboratory, collaborated with

5  me and my company in the effort to isolate telomerase, and

6  Dr. Carol Greider was a scientist there, Cold Spring Harbor.

7  Dr. Elizabeth Blackburn was at UCSF.  So we sponsored research

8  in Carol Greider's lab, and -- and she subsequently won the

9  Nobel Prize for some of those work.  And then Dr. Blackburn and

10 I co-authored -- co-invented patents together early on.

11 Q    Thank you.

12      Mr. West, do you consider yourself an expert in the field

13 of embryonic development and aging?

14 A    Oh, certainly.  Yes.

15 Q    Are there any other credentials that you have or any other

16 experience that you have that makes you consider yourself an

17 expert in this field?

18 A    Well, I suppose anyone can call themselves an expert, but

19 I've been rendered an expert by the U.S. Patent Office in

20 patent interference proceedings in the past, and I was invited

21 by the U.S. House of Representatives to testify once there as

22 an expert in developmental biology and cell biology in the

23 context of the ongoing discussion about stem cells, many of you

24 may remember.  And then the U.S. Senate Appropriations

25 Committee asked me to testify numerous times.  I don't remember

Michael D. West, Ph.D. - Direct

1  how many times offhand, but it was at least two or three times

2  in the U.S. Senate as an expert in this field.

3  Q    Thank you.

4        MR. ROMANOVSKY:  Your Honor, at this time petitioner

5  moves to admit Mr. West as an expert witness in the field of

6  embryonic development and biology.

7        THE COURT:  Any objection?

8        MR. HARTMAN:  Your Honor, we would object.  The

9  declaration was filed at 1:00 in the morning.  We haven't had

10  an opportunity to file any time for objections or to consult

11  with our own witnesses, and so we would object to designating

12  this witness as an expert in this field.

13        THE COURT:  I agree that the witness list was filed

14  late.  I saw it approximately the same time you did.  It

15  doesn't help in that respect.  This witness is qualified on

16  this issue, and you may cross-examine him about both his

17  qualifications and any other subject within the scope of the

18  direct.

19      Any further questions for this witness?

20        MR. ROMANOVSKY:  Yes.  Just a few, Your Honor.

21  Q    Mr. West, are you familiar with Ms. Petrova's scientific

22  work?

23  A    Yes, I am.

24  Q    And how did you become familiar with her work?

25  A    I read her papers.  She has four papers that were

Michael D. West, Ph.D. - Direct

1  published in peer-reviewed scientific publications, which are

2  readily available on PubMed, the electronic database.  I read

3  those carefully as well as her CV, her curriculum vitae.

4  Q    And what conclusions did you come to after reviewing

5  Ms. Petrova's scientific work?

6  A    Well, I would say somewhat passionately that it is

7  excellent science.  *Developmental Biology*, for instance, on

8  which she's a first author on that paper, meaning that she did

9  the majority of the work and is responsible for the paper,

10  *Developmental Biology* is a leading scientific publication.  The

11  paper describes the heart of what's so exciting about this

12  field, which is we now have the potential to understand in fine

13  detail, sort of like a Rand McNally *Road Atlas*, the biology of

14  development, and within that she states in the paper there's

15  the potential to understand, by mapping early embryonic

16  development, novel ways of intervening in the biology of

17  regeneration and aging, addressing some of the world's greatest

18  problems, one of the greatest problems we have in the United

19  States, for instance, with the health care expenditures.

20      The other papers demonstrate her skills in what's probably

21  the most valuable and needed area right now in medical

22  research, which I'll just call bioinformatics.  So she's highly

23  trained in that field.  The papers cite her role in providing

24  bioinformatics expertise to Harvard Medical School and Institut

25  Curie in these papers.

Michael D. West, Ph.D. - Direct

1    Why is this so important and valuable?  It -- the field of
2 medical research just in the last 20 years, let alone my career
3 in medical research, has transformed remarkably.  So what would
4 be -- what would take weeks or even years of research can now
5 be done in a few days for a few hundred dollars.  It would be
6 like comparing a drop of water to the Niagara Falls.  The
7 amount of data we can extract and these researches we're trying
8 to extract from a laboratory model, an important laboratory
9 model, the Xenopus model, widely used, was -- would generate,
10 you know, terabytes of data, massive amounts of data.
11    And her skills to perform mathematical manipulations of
12 this data and put it in an interpretable form when there's so
13 much data that we can now extract from cells and from diseased
14 tissues or developing tissues in this case means that people
15 with her skill sets are highly sought after.  Somewhat similar
16 to the way in artificial intelligence experts in this field,
17 you know, receive great salaries and are greatly sought after
18 by industry, in the same way in the medical field people with
19 the skills that she has are sought after, and I can see
20 why Harvard Medical School would like to hire her.  Companies
21 like my own would like to hire people with these skill sets.
22 Q    So would you hire Ms. Petrova if she applied for
23 employment in your company?
24 A    Yeah, I would.  In a heartbeat.  Absolutely.  Yeah.  100
25 percent.

Michael D. West, Ph.D. - Direct/Cross

1  Q     Thank you, Mr. West.

2          MR. ROMANOVSKY:  I have no further questions for this

3  witness, Your Honor.

4          THE COURT:  Any cross-examination?

5          MR. HARTMAN:  I just have one question.

6                          CROSS-EXAMINATION

7  BY MR. HARTMAN:

8  Q     Good morning, Dr. West.

9  A     Good morning.

10 Q     Have you personally examined the samples that Ms. Petrova

11 brought to the United States?

12 A     No.

13 Q     Thank you.

14         MR. ROMANOVSKY:  Your Honor, may I just comment on the

15 late filing of the witness list?

16         THE COURT:  Sure.  First let me ask you, do you have

17 any redirect for this witness?

18         MR. ROMANOVSKY:  No, we do not.

19         THE COURT:  So Mr. West is excused as a witness.

20      (The witness was excused.)

21         THE COURT:  And now you want to address the late

22 filing, and you may do so.

23         MR. ROMANOVSKY:  Yes.  And I apologize for the late

24 filing, Your Honor, but we received Mr. West's declaration

25 yesterday, and this was because he was able to receive a

Cora E. Anderson - Direct

1  response from the Institut Curie in France yesterday.  We did

2  know that there's a chance he would be testifying.  We did

3  provide his name to the opposing counsel a couple of days ago,

4  at least.

5          THE COURT:  And a -- kind of a synopsis of what he

6  would testify about?

7          MR. ROMANOVSKY:  No.  We -- at that point we could not

8  confirm because he was still waiting to hear from the French

9  lab.

10          THE COURT:  Okay.  Your next witness.

11          MR. ROMANOVSKY:  Thank you, Your Honor.  Petitioner

12  calls Cora Anderson.

13          COURTROOM DEPUTY:  Please raise your right hand.

14                      CORA E. ANDERSON,

15     having been first duly sworn by the courtroom deputy,

16               was examined and testified as follows:

17          THE WITNESS:  I do.

18                      DIRECT EXAMINATION

19  BY MR. ROMANOVSKY:

20  Q    Good morning, Ms. Anderson.

21  A    Good morning.

22  Q    Please state your full name for the record.

23  A    Cora Elizabeth Anderson.

24  Q    Ms. Anderson, what do you do for a living?

25  A    I'm a research assistant in Marc Kirschner's lab at

Cora E. Anderson - Direct

1  Harvard Medical School.

2  Q    And what do you research?

3  A    I actually am on two separate projects, but mostly Wnt

4  pathway and previously I worked with Xenopus on the single-cell

5  project.

6  Q    Do you know Kseniia Petrova?

7  A    Yes.

8  Q    And how do you know her?

9  A    I met her when she first came to the U.S.  She works with

10  me, and we are friends.

11  Q    I apologize.  Did you say you are friends?

12  A    Yes, we are friends.

13  Q    Okay.  And how long have you known Ms. Petrova for?

14  A    A little over two years.

15  Q    Based on what you know about Ms. Petrova, do you consider

16  her to be a danger to the community?

17  A    Absolutely not.

18  Q    And what makes you feel that way?

19  A    We've been through a couple of situations where she has

20  been abnormally kind.  Perhaps "abnormally" is the wrong word.

21  But situations where most people would react rudely or make a

22  scene, and she has behaved with nothing but grace.

23  Q    Could you give us some examples of what you're describing.

24  A    Yes.  When she first came to the U.S., we went apartment

25  hunting, and a couple of these times were very hot and we were

Cora E. Anderson - Direct

1  on and off transit and walking in the wrong direction, and one

2  particular house -- or apartment we went to look at was -- I

3  don't recall where it was, but it was a sublet, and the man who

4  was showing us around the apartment was rather uncomfortable, I

5  would say creepy, and was insinuating that he was going to

6  continue to leave his things in the room that was intended for

7  Kseniia and that he would be able to unlock her door.

8       It was a generally uncomfortable situation, and I wasn't

9  even going to live there.  I can't imagine what that was like

10  for Kseniia, who was first coming here as a young woman and

11  looking for a place for solace and safety.  I -- I don't know

12  how she did it, but she did not run out.  She was not rude to

13  him.  She still thanked him for showing us the apartment, and

14  we left in an orderly manner.

15  Q    Thank you.  Can you think of some other examples of --

16  that illustrate your point?

17  A    There was another time that we were waiting in line at a

18  museum, and she stepped out to look at something.  We were very

19  well established in the line.  We were there together.  There

20  was no running up for her to join me or anything like that.  We

21  were there.  She stepped out, and there was a man behind us

22  that I guess was frustrated with the wait and started a little

23  bit of static about people getting in and out of line even

24  though we were very well established in line, and I think I

25  went to shoot a glance, and she just said it was fine and

Cora E. Anderson - Direct

1  apologized to him.  Even though she didn't do anything wrong,

2  she was very kind and just turned around and apologized and

3  just didn't step back out.

4  Q    Do you consider Kseniia a close friend of yours?

5  A    Yes.

6  Q    And is she a kind person?

7  A    Oh, she is abundantly kind.

8  Q    What makes you say that?

9  A    She will go out of her way to do things for others, even

10  sometimes to her own detriment, and she doesn't ever draw any

11  attention to the fact that she does it, and it just seems to be

12  an endless well of kindness.

13  Q    In your opinion, if Kseniia is released, from what you

14  know about Kseniia, do you think she is likely to harm anybody?

15  A    Absolutely not.

16  Q    Do you consider her a trustworthy person?

17  A    Yes.

18  Q    And what makes you say that?

19  A    We have worked together and also have made -- we have had

20  many social things that we've done together.  I can give

21  examples of those.

22  Q    Yes.  If you could provide some examples --

23  A    Okay.

24  Q    -- that would be great.

25  A    So we have worked on projects together many times, and

Cora E. Anderson - Direct

1  there was a point when we were planning over the weekend or

2  around other things that we were doing and it was necessary for

3  her to do a step and then I -- myself to do a step or myself to

4  do a step and her to do a step, and timing was very important,

5  and the accuracy of, like, reflecting what had been done

6  beforehand was very important, and we coordinated these things

7  time and time again, and I had no doubt that if she said, "This

8  is what I have done with this.  Here it is for you to do," or

9  vice versa, I've never had any problem with -- with

10 coordinating even kind of intricate protocols or -- or

11 experiments.

12 Q    And from what you know about Kseniia, if she is released

13 from custody, how likely do you think it is that she will

14 appear for any scheduled court hearings?

15 A    Incredibly likely.  Undoubtable.

16 Q    Thank you.

17        MR. ROMANOVSKY:  I have no further questions.

18        THE COURT:  Any cross-examination?

19        MR. HARTMAN:  The government has no questions.

20        THE COURT:  I have a couple questions for you,

21 Ms. Anderson.  What are Ms. Petrova's connections to the United

22 States, the District of Massachusetts?  I understand she has no

23 connections to Vermont, but does she have a place to live?

24 What's your understanding of her work situation?  Does she have

25 bank accounts?  *Et cetera.*

Cora E. Anderson - Direct

1          THE WITNESS:  She has a very strong connection to

2    Massachusetts and the U.S. overall.  She has a place to live,

3    and she has lived there for a while.

4          THE COURT:  How long has she lived there?

5          THE WITNESS:  I do not recall right off, but maybe

6    about a year.  And before that she lived not very far away,

7    also in Boston.

8       And she loves her job, and any communication that we've

9    had while she's been detained has been about how much she

10   misses work and how she can't wait to be back, and -- and she

11   loves her friends and her colleagues very much, and I do not

12   doubt that she would absolutely love to return and do anything

13   to be back.

14         THE COURT:  And when did you first meet her?  What

15   year?

16         THE WITNESS:  2023.

17         THE COURT:  And in what context?

18         THE WITNESS:  Our initial meeting was actually over

19   messages before she got here, and then we met in person to go

20   house hunting and also to welcome her to the lab.

21         THE COURT:  All right.  So you work at the lab with

22   her?

23         THE WITNESS:  Yes.

24         THE COURT:  Okay.  And on any given day or week, how

25   often do you have an opportunity to observe Ms. Petrova and

Maria Daikova - Direct

1 have communications with her?

2          THE WITNESS:  Daily.

3          THE COURT:  Daily.

4          THE WITNESS:  Multiple times a day.

5          THE COURT:  Any follow-up questions based on the

6 Court's questioning?

7          MR. ROMANOVSKY:  No, Your Honor.  Thank you.

8          MR. HARTMAN:  No, Your Honor.

9          THE COURT:  Thank you.  You may step down.

10     (The witness was excused.)

11          THE COURT:  You may call your next witness.

12          MR. ROMANOVSKY:  Petitioner calls Maria Daikova,

13 please.

14          COURTROOM DEPUTY:  Please raise your right hand.

15                    MARIA DAIKOVA,

16     having been first duly sworn by the courtroom deputy,

17              was examined and testified as follows:

18          THE WITNESS:  Yes, I do.

19                    DIRECT EXAMINATION

20 BY MR. ROMANOVSKY:

21 Q    Good morning, Ms. Daikova.

22 A    Good morning.

23 Q    Could you please state your full name for the record.

24 A    Maria Daikova.

25 Q    Thank you.  Where do you work?

Maria Daikova - Direct

1 A    I work in Harvard Medical School, Marc Kirschner lab.  I

2 am bioinformatician.

3 Q    Can you repeat your job title, please.

4 A    I am a research assistant and bioinformatician in Harvard

5 Medical School in Marc Kirschner lab.

6 Q    Can you describe for us what you do as a bioinformatician.

7 A    My main goal is development and training machine learning

8 models for biological images for finding the differences

9 between different samples, different diseases for aging

10 research, and other biological imaging samples.

11 Q    And how long have you been working at Harvard?

12 A    For one month.

13 Q    Where do you currently reside, Ms. Daikova?

14 A    I'm sorry?

15 Q    Where do you currently reside?  Where do you live?

16 A    I live in Boston.

17 Q    And do you know Kseniia Petrova?

18 A    Yes, I know.

19 Q    When did you first meet Kseniia Petrova?

20 A    We meet -- we met five years ago.  We studied together

21 in -- we did our master degree together in Moscow.

22 Q    In what institution?  I apologize.

23 A    Moscow Physics and Technology Institute.

24 Q    And do you consider yourself to be a friend of

25 Ms. Petrova?

Maria Daikova - Direct

1  A    Yes.  We are friends.  We are close friends.

2  Q    When did you become friends?

3  A    We become friends when we studied together when Kseniia a

4  lot of time help me and support me through our -- through my

5  study of biology and bioinformatics.

6  Q    Based on your personal knowledge, do you think Ms. Petrova

7  is a danger to anybody?

8  A    No.  Absolutely not.

9  Q    What makes you say that?

10 A    Because I have not seen any situation when Kseniia was a

11 danger for society.  She oftentime helped me.  She helped me to

12 study biology.  She helped me in my personal life, and she

13 spent her personal time to help me, to support me when she

14 could have spent this time for her own job and her own study.

15 She a lot of time spent time for me.

16 Q    Have you ever seen her act aggressively towards anyone?

17 A    No.  Absolutely not.

18 Q    Raise her voice at anyone?

19 A    No.  I think this is the most quiet and positive person

20 that I know.

21 Q    Based on what you know about Kseniia, if she is released,

22 how likely do you think it is that she will harm somebody?

23 A    No.  I think she will go to all judgments that she needs.

24 Q    Do you consider Kseniia a reliable person?

25 A    Yeah.  Absolutely.

Maria Daikova - Cross

1  Q     What makes you think she is?

2  A     Because when we worked together and when we did our master

3  degree and we did our common student projects, she -- she did

4  all tasks that she needs.  When I had a situation when I needed

5  to finish my own work but I didn't have the time because I had

6  a lot of other tasks on my work, Kseniia suggest me to give

7  part of my work, and it was only one day to finish this

8  project, and she did it in her own time, in her weekend, but --

9  she didn't need to do it, but she did it, and she successfully

10  finished it, and not only finished it successfully but she

11  suggested her own way with bioinformatician models that help us

12  to be -- to go to next step of this project.

13         MR. ROMANOVSKY:  I have no further questions for this

14  witness, Your Honor.

15         THE COURT:  Mr. Hartman, any cross-examination?

16         MR. HARTMAN:  Just quickly, Your Honor.

17                       CROSS-EXAMINATION

18  BY MR. HARTMAN:

19  Q     Good morning, ma'am.

20  A     Good morning.

21  Q     Where did you work before beginning at Harvard a month

22  ago?

23  A     I worked in Israel, company called TargetGene

24  Biotechnologies.

25  Q     Did you work with Ms. Petrova at the same Harvard lab

                    Marc W. Kirschner, Ph.D. - Direct

1  before she was detained?

2  A     No.

3  Q     Thank you.

4          MR. HARTMAN:  No further questions, Your Honor.

5          THE COURT:  All right.  Any redirect?

6          MR. ROMANOVSKY:  No, Your Honor.

7          THE COURT:  Thank you.  You may step down.

8          THE WITNESS:  Thank you.

9      (The witness was excused.)

10         THE COURT:  Any further witnesses for the petitioner?

11         MR. ROMANOVSKY:  Just one more, Your Honor.

12  Petitioner calls Marc Kirschner.

13         COURTROOM DEPUTY:  Good morning.  Please raise your

14  right hand.

15                    MARC W. KIRSCHNER, Ph.D.,

16      having been first duly sworn by the courtroom deputy,

17             was examined and testified as follows:

18         THE WITNESS:  I do.

19                    DIRECT EXAMINATION

20  BY MR. ROMANOVSKY:

21  Q     Good morning, Mr. Kirschner.

22  A     Good morning.

23  Q     Could you please state your full name for the record.

24  A     Marc Wallace Kirschner.

25  Q     Thank you.  Mr. Kirschner, what do you do for a living?

Marc W. Kirschner, Ph.D. - Direct

1  A    I'm a professor of systems biology, which is sort of

2  mathematics and biology together, at Harvard Medical School,

3  and I run a lab there.

4  Q    Could you please describe your education and your

5  experience in the field, if you can do it briefly.

6  A    Yes.  I think my whole career has been sort of oscillating

7  between physics and mathematics and chemistry on one level and

8  biology on the other.  So I was trained as a biochemist in my

9  Ph.D. work, but then I went deeply into biology, developmental

10 biology and also cell biology.  And then maybe because of that

11 background or maybe my interest in growing that field, I

12 involved mathematical and computational issues and fundamental

13 problems of biology.

14 Q    Mr. Kirschner, do you love what you do?

15 A    I do.  I can't think of anything better.

16 Q    Do you think it is important?

17 A    I think it's important.  And I think I could demonstrate

18 that other people also think it's important.

19 Q    How do you know Kseniia Petrova?

20 A    I met Kseniia Petrova.  She came to the lab.  This is not

21 an unusual situation where people come in knowing very little

22 biology but being very strong in mathematical or computational

23 fields, and she came to the lab well recommended.  Her

24 intention was to use her background to grow biological

25 questions but also very much to really understand what the

Marc W. Kirschner, Ph.D. - Direct

1  biological questions were.  So it was both a working experience

2  for her and an educational experience for her.

3  Q    Could you describe your first interactions with

4  Ms. Petrova.

5  A    I could.  I mean, I'm not sure it's the very first moment

6  I met her, but, I mean, the early interactions.  I would say

7  that she was very shy.  She -- I could tell she was extremely

8  interested in learning about biology, so she would ask

9  questions even though she had some difficulty sometimes

10 formulating them in good English in those early days.  But then

11 also it went on to her really thinking hard about how she could

12 contribute to the work that was going on in the lab, and she

13 made a very big contribution in bringing certain -- very

14 advanced computational things into problems that we were very

15 interested in.

16 Q    Can you describe her contribution a little more.

17 A    Yes.  We invented a microscope that used a new type of

18 microscopy.  We received a patent from the U.S. government on

19 this microscope.  It generated lots of amazing pictures in --

20 of tissues.  We were interested in disease in tissue,

21 interested in aging in tissues, but it gave all this

22 information.  But we were stymied by how we could convert this

23 spatial information into something quantitative and we could

24 really reason with, and we had made some steps doing that with

25 some people that were at Harvard which, in retrospect, were

Marc W. Kirschner, Ph.D. - Direct

1  inadequate, because when Kseniia got involved, she applied some

2  very powerful methods that clarified these things completely

3  and allowed us to extract new information from the microscopic

4  images.

5  Q    So do you consider her impact on the lab's work

6  significant?

7  A    Yes.

8  Q    Now that she's been missing from the lab for the past

9  three months, did that have any impact on the research that the

10 lab was conducting?

11 A    Yes.  I would say that had she disappeared a couple months

12 earlier, we would be in much worse shape, so she left things

13 that we could use, but at the same time, all sorts of questions

14 that could be answered by computational approaches on these

15 images weren't explored.  But I'm just so grateful for what she

16 left before she disappeared, because she left it in very good

17 shape that other people could apply these methods.

18 Q    I would like to ask you a few questions about Kseniia's

19 character as a person.  How often did you interact with Kseniia

20 when she was in the lab?

21 A    Well, I interacted with her every few days, I would say,

22 with having a conversation with her.  But same way with other

23 people in the laboratory.  Sometimes they're just working and I

24 don't have anything special to add or to question them, and

25 then there's some times where you spend time really delving

Marc W. Kirschner, Ph.D. - Direct

1  into this and spending a lot of time.

2      And one of those was when we were first getting these

3  images and using conventional methods of computational methods,

4  she came to us and said, "There's a better way.  There's some

5  newer methods."  And she helped develop those methods so that

6  we could apply them to those images.  Fortunately, we could

7  still apply them even if she's not there, but we can't further

8  develop them in quite the same way they would have if she were

9  there.

10  Q    And from your interactions with Ms. Petrova, how would you

11  describe her as a person?

12  A    I -- I think the most important thing I would -- is she

13  has -- she's on a mission to learn biology.  She's -- she asks

14  me questions about biology far outside her own work.  I think

15  she feels this is what she wants to contribute in, so I think

16  that's kind of her scientific personality.

17      Her -- her personal personality or cultural personality or

18  whatever you want to call it is that she's very cooperative;

19  she pitches in; she participates in all social things; she does

20  a lot of work for those things.  She's just a very fine person,

21  and the only barrier, which is getting much better, was that it

22  took -- takes some time sometimes to talk to her to really get

23  things across because her language was not at the level of all

24  the native people in our lab, but she's gotten much, much

25  better at that, but at the beginning it was work to try to talk

Marc W. Kirschner, Ph.D. - Direct

1  to her.

2  Q    How would you describe her language abilities now?

3  A    Well, either I've grown quite accustomed to her way of

4  speaking or she's also improved, and I think it's a little bit

5  of both.  I -- I really do enjoy talking to her, and she comes

6  to me with questions which are outside what she's working on

7  because she's curious about the biology.  She wants to learn

8  it.  And I think -- you know, I would say that my biological

9  background has been very broad, so she asks me about all sorts

10 of things, and I usually know something about them.

11 Q    You mentioned that when you met her she was very shy.

12 Would you say she continues to be shy?

13 A    Well, I think the shyness came in two parts.  She

14 recognized that her language skill -- spoken language skills

15 needed improvement, and that got better and better as she spent

16 more time talking to people, so I think that was the major

17 issue.

18 Q    Have you ever seen Ms. Petrova being disrespectful to

19 anybody in the lab or outside the lab?

20 A    I think if I were to think of a person in the lab who

21 would least be disrespect- -- most people are not

22 disrespectful.  It's a very respectful group.  But she would be

23 the last person who would be -- I could think of as being

24 disrespectful.

25          MR. ROMANOVSKY:  I have no further questions for this

1  witness, Your Honor.

2          THE COURT:  Mr. Hartman, any cross-examination?

3          MR. HARTMAN:  The government has no questions for

4  Dr. Kirschner.

5          THE COURT:  Thank you, sir.  You may step down.

6      (The witness was excused.)

7          THE COURT:  So you have no further witnesses for the

8  petitioner; is that correct?

9          MR. ROMANOVSKY:  That is correct, Your Honor.

10          THE COURT:  Are you asking that the Court admit

11  Exhibits A through J to your first amended petition for writ of

12  habeas corpus and complaint for declaratory judgment and

13  injunctive relief, which is Document 57-1, now that the Court

14  has ruled on the motion for leave to amend?

15          MR. ROMANOVSKY:  Yes, Your Honor.

16          THE COURT:  Any objection to those being admitted for

17  purposes of this hearing?

18          MR. HARTMAN:  Yes, Your Honor.  Just in that they

19  were -- the petition was amended today, so we have not had a

20  chance to review the documents after the Court's ruling.

21          THE COURT:  Well, the petition was -- leave was

22  granted today.  The petition was filed on the 22nd, and I'm

23  confident, because you've been very attentive to your duties,

24  that you've read the petition --

25          MR. HARTMAN:  I have.

1        THE COURT:  -- revised petition.  Yes.  So any

2  objection, other than that I granted leave to amend today, to

3  admitting Exhibits A through J?

4        MR. HARTMAN:  Just to reserve the government's ability

5  to respond to the petition and the attachments in due course,

6  Your Honor.  Thank you.

7        THE COURT:  And I have indicated that I'm going to

8  grant you 14 days, or more time if you want, to supplement your

9  motion to dismiss.

10       Exhibits A through J to Document 57-1 are admitted.

11       (Petitioner Exhibits A-J were received in evidence.)

12       THE COURT:  I'm now going to hear your arguments on

13  the bail hearing, and I'm going to talk about first the things

14  I think we all agree on, and then I'm going to address for you

15  some of the questions I still have after your filings, which I

16  have obviously read and found very helpful.

17       I think both parties agree that this court has no

18  jurisdiction to review or stop Ms. Petrova's removal

19  proceedings.  I think that you both agree that this court has

20  no jurisdiction to enjoin the government's criminal case

21  against her.  And I think we all agree there's no order of

22  removal, so this court is not going to be reviewing an order of

23  removal, and if there was one, that would be outside this

24  court's jurisdiction.

25       I think we all agree that in terms of her detention by

1  ICE/HSI, and I'm going to use those interchangeably,

2  Ms. Petrova has exhausted her administrative remedies by twice

3  asking for parole and twice receiving denials of parole even

4  though the reasons for those denials seem to have shifted a

5  bit.

6      I think both parties agree that Ms. Petrova is not a

7  danger to the safety of the community or another person in the

8  community.  I know the government has made a representation to

9  the Western District of Louisiana court that "Considering the

10  lack of criminal history, Ms. Petrova does not pose a danger to

11  the community" and that in terms if bail was granted, the only

12  remaining concern is a risk of nonappearance.  If I have that

13  wrong, you're free to correct me, but I think that that's where

14  we're at.

15      I think it's uncontested that Ms. Petrova has been in the

16  United States helping the United States perform important

17  biological research, and I don't know if there's any contest as

18  to whether the biological samples that she brought to Logan

19  Airport and which are the basis for the revocation of her visa,

20  they're nonhazardous, nontoxic, not alive.  I don't expect you

21  to fully brief that issue, but I wondered if that's something

22  that we all agree on or if it's a contested issue.

23      The government has asked that this case be transferred to

24  the District of Massachusetts, arguing that all the operative

25  facts took place there.  The petitioner in turn has asked this

1  court to rule that if she remains detained, she be detained in

2  the District of Massachusetts or surrounding states, including

3  Vermont.  So I am wondering to what extent that if the criminal

4  case is proceeding in Massachusetts, whether, after this court

5  rules, this case should be transferred to the District of

6  Massachusetts.  There is an open question, even though the

7  district court ruled that the individuals in *Ozturk* and *Mahdawi*

8  could not be removed and could not be detained outside a

9  particular location, whether the Court can actually direct

10 somebody be -- to be detained here or there or whether that's

11 the Executive Branch's prerogative.

12      I can let you know in your typical criminal case, I do not

13 tell the marshals where to detain somebody.  I might ask that

14 somebody can, you know, remain at a certain location for some

15 rehabilitative purpose or some medical purpose, but it's really

16 the marshals' prerogative as to where people are detained.

17      I'm wondering if this court grants Ms. Petrova's release

18 from the ICE detainer that -- and if the magistrate judge in

19 the criminal case decides to release her as well, whether or

20 not the government's position is that ICE could just rearrest

21 her, and if so, I want to know what the basis of that is.

22      And then I'm wondering if this court decides to release

23 her and the District of Massachusetts decides not to release

24 her, whether the petitioner concedes that at least as far as

25 bail, that's outside of this court's jurisdiction.

1    We took up this argument in the course of the motion to
2 dismiss oral argument, and I want to make sure I understand the
3 government's position on this point.  So I know the government
4 believes this court does not have jurisdiction to entertain
5 this petition, that these are removal proceedings, that it's
6 outside the scope of what a district court can do, but I don't
7 have a clear statement as to whether the government agrees that
8 if the Court says it has no jurisdiction to determine whether
9 or not the immigration officer acted lawfully and violated due
10 process, that no court's going to consider that.
11    The immigration court is not going to take up any
12 constitutional issues.  The immigration court is not going to
13 determine whether an immigration officer has lawful authority
14 to revoke somebody's visa for a customs violation.  Those
15 issues will be undecided by anybody because the immigration
16 court does not have jurisdiction to consider APA,
17 Administrative Procedure Act, claims, and the immigration court
18 does not have authority to consider constitutional issues, so
19 do you concede that if this court doesn't decide it, nobody
20 will be deciding those issues?
21    Finally, the Commonwealth of Massachusetts has filed an
22 amicus brief, and I have heard from the petitioner about that,
23 but the petitioner's claims are a bit different from the
24 Commonwealth of Massachusetts', and I haven't really heard the
25 government's position.  So the Commonwealth of Massachusetts

1  has been granted and has filed an amicus brief basically saying

2  that Ms. Petrova's case is part of a larger battle against

3  Harvard University and reflects, and I quote, "policy and

4  practice of targeting international students and

5  academics . . . for visa revocation and detention."  They claim

6  it's done for trivial and unlawful reasons, it's part of a

7  retaliatory purpose.  Ms. Petrova, even in her revised habeas

8  petition, doesn't advance that claim, and I wonder if there is,

9  therefore, no basis in her petition to consider it or whether

10 she thinks that because the Commonwealth has raised that in the

11 amicus brief it's something that the Court should consider as

12 well.

13      So I'm going to start with Ms. Petrova's counsel.  I think

14 we all agree that the governing standard is in *Mapp v. Reno* and

15 that in order for this court to release Ms. Petrova on bail,

16 the Court must find that the petitioner has demonstrated that

17 "the habeas petition raises substantial claims" and that

18 "extraordinary circumstances exist that make the grant of bail

19 necessary to make the habeas remedy effective."

20      Let's start with you, Mr. Romanovsky.

21          MR. ROMANOVSKY:  Thank you, Your Honor.

22      If I can make some comments on the *Mapp* standard and then

23 try to address some of the issues that you raised, please.

24      So Ms. Petrova has raised substantial claims.  It is our

25 position that the conduct of CBP officers at Logan Airport on

1  February 16th was unlawful.  I think we have demonstrated that

2  the officers did not have a legitimate reason to revoke

3  Ms. Petrova's valid J-1 visa.  We have demonstrated that the

4  finding of inadmissibility based on her alleged customs

5  violation was not a proper finding of inadmissibility.  The

6  Immigration and Nationality Act does not contain a provision

7  that makes one inadmissible for committing a customs violation.

8      Because we showed that the government's conduct at the

9  airport was unlawful, the APA allows this court -- the

10 Administrative Procedure Act allows this court to set that

11 conduct aside, and if that conduct is set aside, then the

12 detention of Ms. Petrova becomes unlawful.  So we do

13 respectfully maintain that she has raised substantial claims.

14     As far as the extraordinary circumstances, the Court in

15 *Mahdawi* held that even the lack of danger to the community or

16 flight risk could serve as an extraordinary circumstance, but

17 there's a lot more in this particular case.  Mr. West testified

18 about the value of Ms. Petrova's research to the national

19 interests of the United States.  Mr. Kirschner, the head of the

20 lab, testified as to the dramatic effect that Ms. Petrova's

21 presence in his lab had on the work that the lab was doing.  We

22 respectfully suggest that it qualifies as an extraordinary

23 circumstance.

24     And one additional extraordinary circumstance is the

25 apparent government misconduct in the use of the criminal

1  prosecution to gain advantage in the immigration case, and we

2  have consulted several customs experts, and everybody agrees

3  that people just don't get prosecuted for smuggling in a

4  situation like this.

5      So all of the things point to some really extraordinary

6  circumstances in this case, and we respectfully request that

7  Ms. Petrova be ordered released on bail because the release on

8  bail is what needs to happen to make the habeas remedy

9  effective.

10     As far as the points that Your Honor raised that I wanted

11  to address, I -- the petitioner agrees with all of the points

12  that Your Honor listed as uncontested.  Obviously I can't speak

13  for the government, but we do agree that the biological samples

14  were not really biological in the sense that they were inert

15  and posed no threat to anybody, and Mr. West actually reached

16  out to the lab in France to verify what it was exactly that

17  Ms. Petrova was bringing to the United States, and he testified

18  credibly as to the nature of the embryos, and he testified that

19  they were as dangerous as a piece of leather, meaning they were

20  not dangerous at all.

21     We also agree that the habeas remedies have been

22  exhausted, although I do want to point out that Ms. Petrova

23  requested parole from ICE on three occasions.  The first

24  request was not responded to, and the two subsequent requests

25  received those standard denials with the boxes checked next to

1  danger to the community and -- and flight risk.  The first one

2  was just the flight risk, and somehow while being in ICE

3  detention, Ms. Petrova became a danger to the community for

4  purposes of the second denial.

5       As far as the jurisdictional piece, we do agree with this

6  court that this court has no jurisdiction to stop Ms. Petrova's

7  removal proceedings, and we do concede that if the criminal

8  court in Massachusetts does not release Ms. Petrova on bail,

9  this court is unlikely to have any jurisdiction to order

10 release in this case.  We are, however, asking for an order

11 from this court to enjoin ICE from re-detaining Ms. Petrova if

12 she is released on bail from criminal custody, and it is not

13 just likely, it is virtually certain that ICE will pick her up

14 as soon as she is released from criminal custody.

15      There's an immigration detainer lodged by ICE.  DHS has

16 already confirmed that they plan to detain Ms. Petrova as soon

17 as she's released from criminal custody.  As a matter of fact,

18 they maintain that they must do that, and in the immigration

19 court case in Louisiana, the government filed a motion to

20 postpone their response to our request to change venue to

21 Massachusetts because they think that she's going to end up in

22 Louisiana.

23      And just this morning, about an hour ago, the immigration

24 judge in Louisiana granted DHS's motion to postpone their

25 response.  Everybody is waiting for this hearing to take place,

1  and the government is hoping that Ms. Petrova will go right

2  back into ICE custody as soon as she's released from criminal

3  custody and will go straight to Louisiana.

4      If I may have a second to review Your Honor's other

5  points.

6      Yes.  Regarding Ms. Petrova's case potentially being part

7  of the larger "war on Harvard," we do not allege that in the

8  amended complaint.  We do not -- at this point we do not have

9  enough evidence to allege that.  We can read the tea leaves.

10 We can read between the lines.  But we have -- at this point we

11 have no evidence to suggest that this was the motivation behind

12 Ms. Petrova's initial detention.

13     We did file a request under the Freedom of Information

14 Act, and we do want to get to the bottom of it, and we

15 certainly will amend the complaint if we receive documentation

16 about what actually happened at Logan on February 16th.  The

17 facts just don't -- don't line up, Your Honor.  Things don't

18 happen the way they did, typically.  And this is why we filed

19 the FOIA request, and this is why we will be pursuing all

20 available remedies to get the information that we're entitled

21 to get from the government to understand who made the decision

22 to detain her, who made the decision to prosecute her

23 criminally, and what were the considerations behind those

24 decisions.

25     And finally I wanted to address Your Honor's point

1  regarding the ability of the immigration court to resolve

2  Ms. Petrova's claims.  Ms. Petrova right now is in removal

3  proceedings for "further consideration of her asylum claim."

4  She can only get asylum in immigration court.  She will

5  certainly not get review of her APA claims.  She cannot get her

6  visa reinstated.  She cannot get the determination by CBP set

7  aside by an immigration judge or the BIA.  The Executive Office

8  for Immigration Review does not do this.  They do not resolve

9  the issues that we've brought before this court.

10      If Your Honor has any other questions, I'm happy to answer

11  them.

12          THE COURT:  No.  You answered my questions.  Anything

13  else that you want to say in support of your petition for

14  release at this time?

15          MR. ROMANOVSKY:  No, Your Honor.  We'd just

16  respectfully request that this court issue an order preventing

17  ICE from taking Ms. Petrova back in their custody.

18          THE COURT:  All right.

19          MR. ROMANOVSKY:  Thank you.

20          THE COURT:  Thank you.  And I'll give you the last

21  word after we hear the government's argument.

22          MR. ROMANOVSKY:  Thank you, Your Honor.

23          MR. HARTMAN:  Good morning, Your Honor.

24          THE COURT:  Good morning.

25          MR. HARTMAN:  I think I'm going to start with our

1  threshold argument that the position is moot.  The original

2  petition has been moot since March 7th because Ms. Petrova was

3  placed into removal proceedings as we have discussed.  That was

4  the only relief the Court could order under 1252(e)(4), and so

5  our view is the original petition is moot.

6      To the extent that the bail petition is proceeding on the

7  newly amended petition, our view is that it's moot because

8  she's now in U.S. Marshals' criminal custody, and kind of

9  concomitantly with that is the ripeness issue where we don't

10 know, to Your Honor's point, if she would be detained in

11 Massachusetts or some other venue, and so our view is that

12 under the prudential ripeness doctrine, the Court should wait

13 to resolve the bail issue until the magistrate judge rules on

14 the Bail Reform Act issue and have greater clarity about where

15 exactly DHS would detain her during the pendency of the

16 Massachusetts criminal proceeding.

17      To your point about jurisdiction, so our view is that an

18 immigration judge can certainly address this issue.  The

19 immigration judge in every case has to make a removability

20 determination.  That is 1229c(c)(4)(1)(A) *[sic]*, I believe.

21 And so it's something that an immigration judge does in every

22 case, and Ms. Petrova --

23          THE COURT:  Does the judge, though, review whether or

24 not an immigration officer acted outside of his or her

25 authority?  I didn't see any cases cited from any immigration

1  court to that effect in your filings.

2         MR. HARTMAN:  So I think the immigration judge would

3  need to determine whether the immigration visa was valid,

4  because the charge of inadmissibility under 1182(a)(7) asks

5  that question, and so the bottom-line inquiry, was Ms. Petrova

6  inadmissible -- or is Ms. Petrova inadmissible in her removal

7  proceedings, is one that the immigration judge has to address.

8  And the subsidiary question there is obviously whether the visa

9  is valid or not, and if the immigration judge concluded that

10 Ms. Petrova could meet her burden by clear and convincing

11 evidence to show she was entitled to admission, then in removal

12 proceedings the burden shifts to the Department of Homeland

13 Security, and it would have to lodge a different charge under

14 8 USC 1227, which brings us to the 1227(a)(1)(B) charge that a

15 visa's been revoked, and in that circumstance the burden would

16 be on the government to show that by clear and convincing

17 evidence.

18     In 1201(i) is the jurisdictional provision that makes that

19 reviewable in the Court of Appeals if that's the only basis of

20 removability, so it's a long chain of events, and I know

21 Ms. Petrova has challenged her removability in removal

22 proceedings, and so this is the exact issue that the

23 immigration judge is addressing, and our view is that

24 1252(a)(5)(b)(9), in conjunction with *Delgado*, preclude this

25 court from addressing whether or not she's inadmissible.

1          And to the extent, you know, all of these claims relate

2   back to what happened at Boston Logan, you know, we agree that

3   there is limited habeas review to review expedited removal

4   proceedings, but they're moot, and even under the limited

5   jurisdiction the Court had, as set out in the order to show

6   cause, transfer for a removal proceeding is the only relief,

7   and so in our view those proceedings need to continue, and

8   judicial --

9          THE COURT:  So is it your position that the

10  immigration court can consider constitutional issues?

11         MR. HARTMAN:  That's a tricky question.  The

12  immigration court certainly considers issues like motions to

13  suppress that are predicated on unconstitutional Fourth

14  Amendment search issues.  It's all reviewed *de novo*, but the

15  immigration court and the board could not, for example, strike

16  down a regulation as unconstitutional.  But it can certainly

17  apply existing Court of Appeals precedents that identify some

18  unconstitutional conduct.

19         THE COURT:  Do you agree that the immigration court

20  cannot consider APA claims?

21         MR. HARTMAN:  That's true.  And I want to address the

22  board decision that my friend has cited.  It's a concurring

23  opinion that addresses notice and comment.  So I agree that the

24  board can't find that a regulation that was promulgated didn't

25  adhere to notice and comment requirements.  I agree that the

1  board could not address a claim that rule-making didn't adhere

2  to notice and comment, but the board can certainly address

3  legal issues, and whether or not a noncitizen is inadmissible

4  under an 1182(a)(7) charge is inherently a factual and legal

5  issue that courts can address.

6      It's not cited in our papers, but there's the *Torres* case

7  in the Ninth Circuit that's *en banc* that addresses when the

8  Mariana Islands became part of U.S. territory, whether everyone

9  there was inadmissible under an 1182(a)(7) charge or not, so

10  these are issues that come up frequently in immigration court

11  and that the immigration judge can address and that Ms. Petrova

12  can obtain judicial review of through a petition for review in

13  the appropriate court of appeals.

14      And that goes as well for her visa revocation challenge.

15  In our view 1201(i) funnels that challenge to the Court of

16  Appeals and is the sole basis of her removability, and the

17  reason why it makes sense, because the 22 CFR 41.122

18  regulation, (e)(4) makes it so that if you're ever removed in

19  removal proceedings, whatever visa you have is automatically

20  revoked as a matter of law, and so 1201 has built in this

21  harmless error doctrine where Congress didn't want district

22  courts to be reviewing this issue if it didn't end up mattering

23  to the outcome of removal proceedings.

24      And so our view is that none of those issues are

25  reviewable in a habeas petition.  I think that that goes to our

1  fundamental point on the substantial claim prong of *Mapp* is

2  that Ms. Petrova hasn't demonstrated a substantial claim on the

3  merits.  Her reply, the first paragraph waives any due process

4  challenge to the detention of noncitizens who arrive at a port

5  of entry, and *Jennings* makes clear that detention is mandatory,

6  whether it be under 1252(b)(1) or 1252(b)(2).  And since the

7  ultimate habeas standard is whether detention is contrary to

8  law or unconstitutional, our view is that Ms. Petrova can't

9  meet that burden because *Jennings* controls the statutory

10  question about whether this detention is authorized as a matter

11  of law, and *Thuraissigiam*, *Mezei*, and Ms. Petrova's concession

12  control the constitutional issue.

13      Sorry.  I'm just going through Your Honor's questions.

14          THE COURT:  Take your time.

15          MR. HARTMAN:  So there is an ICE detainer for

16  Ms. Petrova, so if she was released under the Bail Reform Act

17  as part of the Massachusetts criminal case, ICE could re-detain

18  her.  You had asked if ICE would re-detain her in light of this

19  court's order.  I think it would just depend on the substance

20  of the court's order, Your Honor, and whether she --

21          THE COURT:  Would it need a new basis?  So would ICE

22  need a new basis, or could it say, "Yes, the District of

23  Vermont has released her, but we're not going to comply with

24  that order and we're going to just lodge a new ICE detainer on

25  the same grounds and arrest her"?

1          MR. HARTMAN:  So my understanding of the *Ozturk* and

2  *Mahdawi* cases is that the government has not re-detained those

3  noncitizens, and I would expect the government to adhere to the

4  same course of action in this case.  I don't have any

5  indication that the government would act otherwise, Your Honor.

6          THE COURT:  All right.

7          MR. HARTMAN:  As to the Massachusetts amicus, I think

8  we touched on that briefly at the last hearing.  Our view is

9  that this isn't a retaliation case.  The criminal complaint

10 makes clear that Ms. Petrova was detected by a K-9 dog.  I

11 don't know how we alleged that the dog was retaliating against

12 Ms. Petrova in detecting these undeclared samples.

13         THE COURT:  So then you would not concede that these

14 were nonhazardous, not alive?  I mean, I think that -- well, I

15 know a K-9 dog can detect pills now.  They're certainly not

16 alive.  So maybe those two have nothing in common, but let's

17 hear your position, if any, on whether or not these are

18 actually biological samples that posed any risk of harm to any

19 person or if you have no position on that.

20         MR. HARTMAN:  So the government doesn't take a

21 position on that.  In our view it's not relevant to resolving

22 any of the legal issues before the Court.

23    And on the extraordinary circumstances prong of *Mapp*, our

24 view, while Ms. Petrova has many laudable aspects concerning

25 her case, *Mapp* is intended to not be a matter of convenience,

1  and it's really intended to ameliorate extraordinary

2  circumstances, and detention in any case is certainly an

3  inconvenience to the person that's detained, and virtually

4  every noncitizen has some type of work.  That's commendable,

5  and that's just not, under the *Mapp* and *Elkimya* standards,

6  sufficient to grant bail, and so we'd ask the Court to deny

7  Ms. Petrova's request for bail.

8              THE COURT:  Thank you.

9              MR. HARTMAN:  Thank you, Your Honor.

10             THE COURT:  Any brief response from you,

11  Mr. Romanovsky?

12             MR. ROMANOVSKY:  Thank you, Your Honor.

13      Very briefly.  First, regarding the possible new bases for

14  ICE to detain Ms. Petrova if and when she's released from

15  criminal custody, if she's not detained under 1225(b)(1), the

16  only two other possibilities would be 1225(b)(2) if the

17  government can show that Ms. Petrova was not clearly beyond

18  admissible at the time of admission at the border at Logan

19  Airport on February 16th or based on her pending removal

20  proceedings.  We would respectfully maintain that neither of

21  these two grounds would be a *bona fide* reason for ICE to

22  re-detain Ms. Petrova.

23      As far as 1222 --

24             THE COURT:  But let's stay on that, because

25  Mr. Hartman has said, "Look, we didn't do this -- we didn't

1 rearrest them by ICE in Mahdawi or Ozturk.  I don't anticipate
2 that we would do it in this case were she to be released.  This
3 court should be reluctant to enjoin agencies, especially
4 outside the judicial branch, from doing anything it doesn't
5 need to," and why shouldn't the Court take that representation
6 at face value?

7         MR. ROMANOVSKY:  Because they're making two different
8 representations in two different venues, Your Honor.  They're
9 making a representation to the immigration court in Jena,
10 Louisiana, that they are planning to re-detain Ms. Petrova.
11 What they just said to the immigration judge in Louisiana,
12 "Don't change the venue just yet.  We'll see what happens at
13 the hearing, because maybe you don't need to change venue from
14 Louisiana to Boston," it can only mean that they're expecting
15 Ms. Petrova to be back in Louisiana.  And she certainly is not
16 planning to travel to Louisiana on vacation.  It can only mean
17 that the government is planning to re-detain her, and the
18 government has said repeatedly "She is subject to mandatory
19 detention, in our view.  We have to detain her."  And the fact
20 that there's an immigration detainer lodged at the same time
21 she is taken out of ICE custody only suggests that this is the
22 plan.  As soon as she is out from criminal custody, if she is,
23 ICE will pick her up.

24     To go back to the two possible new bases, Your Honor,
25 1225(b)(2), that charge would not be appropriate because there

1  was no other determination made at the airport that she was not

2  beyond doubt admissible at the time of admission.

3      And as far as the other possible basis for her

4  re-detention pending removal proceedings, we would respectfully

5  suggest that the only reason why she is in removal proceedings

6  in the first place is because she was unlawfully -- her visa

7  was unlawfully canceled at the airport and she got detained

8  based on that conduct by -- unlawful conduct by CBP, and this

9  is how she ended up in removal proceedings in the first place.

10  We're certainly not challenging the removal proceedings, but

11  for the government to be able to use the pending removal

12  proceedings that stem directly from the unlawful conduct of CBP

13  at Logan Airport, I don't think it would be proper, Your Honor,

14  so we would respectfully request, if this court is willing to

15  issue an order enjoining ICE from re-detaining Ms. Petrova,

16  there has to be some judicial oversight as to the possible new

17  grounds for re-detention.

18      And just one last point, Your Honor.  I do want to confirm

19  that based on the case law, immigration judges do not have the

20  authority to rule on constitutional issues, and as my friend

21  suggested, there are some collateral constitutional issues that

22  immigration judges have to take into account, but they don't

23  rule on constitutional issues.  They don't rule on APA issues.

24  And in this particular situation, the immigration judge

25  certainly won't rule on the visa revocation.  She is there --

1 Ms. Petrova is there only for further consideration of her

2 asylum claim.

3        Thank you.

4            THE COURT:  Thank you.

5        When it is fully briefed, the Court's going to issue a

6 decision on the motion to dismiss, or if the parties jointly

7 request, the Court may transfer that motion, fully briefed, to

8 the District of Massachusetts.  I'll wait to hear from you on

9 that.

10        For the purposes of the bail hearing, the Court has

11 determined that time is of the essence and that it will further

12 the interest of justice if the Court rules on the record

13 instead of issuing a written decision.

14        The Court makes the following findings of fact by clear

15 and convincing evidence and reaches the following conclusions

16 of law for purposes of the bail hearing only.

17        On March 7th, 2025, ICE issued a notice to appear ordering

18 Ms. Petrova to appear before an immigration judge.  The notice

19 to appear alleged that Ms. Petrova was subject to removal

20 pursuant to 21- -- 212(a)(7)(A)(i)(I) of the Immigration and

21 Nationality Act, the INA, as amended, as an immigrant who "at

22 the time of application for admission . . . is not in

23 possession of a valid unexpired immigrant visa, reentry permit,

24 border crossing card, or other valid entry document required

25 by" the INA "and a valid unexpired passport, or other suitable

1 travel document, or document of identity and nationality . . .

2 is required under the regulations issued by the Attorney

3 General under section" 211(a) of the INA.

4     Although the government's reasons for detaining

5 Ms. Petrova have shifted, this is now the basis for her removal

6 proceeding.  However, the immigration judge in Ms. Petrova's

7 proceedings has ordered ICE to file a Form I-261 after finding

8 that the initial charging document was legally deficient.

9     The Form I-261 sets forth the following allegations in

10 lieu of those set forth in the original charging document:

11     "1.  You are not a citizen or national of the United

12 States;

13     "2.  You are a native of Russia and a citizen of Russia;

14     "On February 16, 2025, you arrived at Boston Logan

15 International Airport seeking admission on a J-1

16 non-immigration visa.

17     "At the time of admission, an immigration officer found

18 you to be inadmissible to the United States due to having

19 undeclared biological material, to wit, frog embryos, in your

20 possession without the proper permits and supporting materials

21 for such material.

22     "You withdrew your application for admission on

23 February 16, 2025.

24     "Your J-1 visa was cancelled on February 16, 2025, under

25 22 C.F.R. Section 41.122(e)(3).

1   "You were not then admitted or paroled after inspection by

2   an Immigration Officer.

3   "You are an immigrant not in possession of a valid

4   unexpired immigration visa, reentry permit, border crossing

5   card, or other valid entry document required by the Immigration

6   and Nationality Act; and/or you are an immigrant not in

7   possession of a valid unexpired passport, or other suitable

8   travel document, or document of identity and nationality."

9   Ms. Petrova's next hearing in immigration court is

10  scheduled for July 22nd, 2025.

11  Ms. Petrova is a researcher at Harvard University with no

12  prior criminal history who has ample ties to the District of

13  Massachusetts, where she has been living and working for

14  several years prior to these proceedings.  Her activities in

15  the United States did nothing to threaten public safety.  To

16  the contrary, she has furthered this country's interest in

17  finding a cure and treatment for cancer in the area of

18  biological and regenerative research.  Her work is described as

19  excellent, exceptional, and of national importance by people

20  qualified to render those opinions.

21  At this point, based on the testimony of Michael West, the

22  Court finds that the evidence supports a conclusion that the

23  samples she brought into the United States are wholly

24  nonhazardous, nontoxic, nonliving, and posed a threat to no

25  one.

1          She was initially detained for a customs violation, and

2     then her visa was revoked for that customs violation and she

3     was placed in removal proceedings because her visa was revoked

4     and she was therefore arriving as an alien without lawful

5     documentation allowing her entry.  This is kind of a circular

6     process because it was the government that revoked her visa,

7     and it's essentially saying, "We revoked your visa.  Now you

8     have no documentation, and now we're going to place you in

9     removal proceedings," and the government has been unequivocal

10    that it intends to deport her to Russia rather than letting her

11    withdraw her application for entry as she requested and go back

12    to France or other countries in which she has lawful status and

13    no fear of persecution or harm.

14         Ms. Petrova filed her habeas petition while incarcerated

15    in the District of Vermont.  Accordingly, the Court's

16    jurisdiction, if any, was vested at that time and was not

17    devested by the Court's -- or the government's determination to

18    transfer her to Louisiana or its decision to charge and arrest

19    her for smuggling goods into the United States in the District

20    of Massachusetts.

21         The Second Circuit has recently ruled in *Ozturk* and

22    *Mahdawi* that a federal court has inherent authority to grant

23    bail to a habeas petitioner within its jurisdiction.  In those

24    cases it also held that the petitioner's claims of unlawful and

25    retaliatory detention are independent of and collateral to the

1  removal process.  The Second Circuit observed that the Supreme
2  Court and our court have explained that 2252(g)'s *[sic]* bar on
3  jurisdiction is narrow and applies only to three discrete
4  actions, a decision to commence proceedings, adjudicate cases,
5  or execute removal orders, and thus is "directed against a
6  particular evil:  attempts to impose judicial constraints upon
7  prosecutorial discretion."

8      This court finds it does not have the authority to revoke
9  or stop or enjoin Ms. Petrova's removal proceedings.  It also
10 has no ability to review, enjoin, or revoke her criminal
11 prosecution by the District of Massachusetts.  But it retains
12 jurisdiction outside these three discrete areas as identified
13 by controlling precedent from the Second Circuit.

14     Under *Mapp v. Reno*, in order for this court to release
15 Ms. Petrova on bail, the petitioner must demonstrate that the
16 habeas petition "raises substantial claims" and that
17 "extraordinary circumstances exist that make the grant of bail
18 necessary to make the habeas remedy effective."

19     The Court addresses first its jurisdiction to proceed.
20 The Court finds two district court cases, *Atanackovic v. Duke*
21 and *Gill v. Mayorkas*, persuasive.  There the courts ruled that
22 notwithstanding the jurisdiction-stripping provisions of the
23 INA, a district court has jurisdiction to review under the APA
24 whether a CBP officer is acting outside his or her lawful
25 authority in revoking a visa.  Those cases stand for the

1  proposition that an immigration officer simply does not have

2  the same authority or discretion as the Secretary of State or

3  consular office in making that determination and which is the

4  determination the immigration officer made in this case.

5       It is very clear in this case that Ms. Petrova was

6  detained solely for a customs violation.  I find the Court has

7  jurisdiction to consider her claim in the context of a habeas

8  petition and whether she is unlawfully detained on that basis

9  and that in doing so the Court does not run afoul of the

10 jurisdiction-stripping provisions of the INA.

11      The immigration officer took action prior to the

12 initiation of removal proceedings and before a notice of

13 removal was issued.  There is no pending notice of a removal.

14 The Second Circuit in both *Ozturk* and *Mahdawi* found that

15 chronology important.

16      The Court also finds the Court has limited jurisdiction to

17 consider Ms. Petrova's due process claim.  As the parties

18 acknowledge, it's congressional due process, which the Court

19 narrows to the question of:  What process is due to an arriving

20 alien?  Does that person have the right to expect an

21 immigration officer to follow applicable law, or does an

22 immigration officer have the authority to take unlawful -- or

23 allegedly unlawful an arbitrary and capricious actions against

24 an arriving alien and have that determination be free from

25 review by any court?

1    In her revised petition, Ms. Petrova argues that the

2  process by which she was detained was unlawful because the

3  immigration officer did not have authority to cancel her visa

4  for a customs violation because she was not in fact bringing

5  biological materials into the country as that term is defined

6  by applicable law, because she was not given the opportunity to

7  leave for France as she requested, and because she has been

8  criminally prosecuted to devest this court of habeas

9  jurisdiction and/or to gain an advantage in a civil proceeding

10 by prosecuting her criminally.  The Court finds her petition

11 raises substantial claims grounded in the facts and the law on

12 which she has shown there is a likelihood she will prevail.

13    The Court next addresses the government's challenge that

14 the Court is deprived of jurisdiction in this case because

15 Ms. Petrova is now in U.S. Marshals' custody.  The majority of

16 circuits have held that filing a detainer alone does not create

17 custody in the INS.  The Second Circuit ruled accordingly in

18 *Simmonds v. I.N.S.* in 2003.

19    It has also ruled that custody may be established where

20 there is a reasonable basis to conclude that INS will take

21 custody of the prisoner upon his or her release from prison.

22 In this case the Court finds the petitioner has established

23 that if this court does not act and she is released by the

24 District of Massachusetts in her criminal proceeding, the ICE

25 detainer will be invoked, she will be reinserted into ICE

1 custody, and she will not be released.

2       The Court further finds that, to the extent necessary,
3 Ms. Petrova has exhausted her administrative remedies.  She has
4 been held in immigration custody continuously for approximately
5 three months.  She has requested parole three times and has
6 been denied parole twice prior to her transfer to the custody
7 of the U.S. marshals.

8       The government has made clear its intention to detain
9 Ms. Petrova while her removal proceedings are pending and to
10 deport her to Russia and in fact contends that her detention is
11 mandatory.  There is thus no reason for the Court to believe
12 that were she to be released on bail in her criminal case the
13 federal officials holding her would ignore the ICE detainer.
14 These facts provide a reasonable basis for concluding ICE will
15 take custody of Ms. Petrova if she is released from federal
16 prison and the U.S. Marshals' custody.

17       Accordingly, I find, based on these facts, that
18 Ms. Petrova remains in the government respondents' custody for
19 purposes of the habeas petition under *Simmonds v. I.N.S.*, and I
20 also find that, at least for purposes of her allegedly unlawful
21 detention, she has exhausted her administrative remedies or
22 that, in the exercise of this court's discretion pursuant to
23 *Beharry v. Ashcroft*, exhaustion should be excused as an
24 administrative appeal would be futile.  She has raised a
25 substantial question about the applicable law and the

1 constitutional guarantees, and the available remedies provide

2 no genuine opportunity for relief.

3      The Court further finds this case in controversy is ripe

4 and that it is not moot.  Ms. Petrova remains detained.  She is

5 now in the U.S. Marshals' custody, but there is an ICE

6 detainer.  This court can grant her at least some of the relief

7 she has requested, such as release from detention, and a

8 declaratory judgment that the immigration officer's actions in

9 this case were unlawful under applicable law and under the APA.

10 The circumstances of this case are capable of repetition not

11 only in Ms. Petrova's case but in other cases as well.

12      I also find this is both an exceptional and unusual case

13 under *Mapp v. Reno*.  Ms. Petrova has submitted compelling

14 declarations and witness testimony that supports the conclusion

15 that what happened in this case was extraordinary and novel,

16 that there does not appear to be either a factual or legal

17 basis for the immigration officers' actions, that Ms. Petrova's

18 life and well-being are in peril if she is deported to Russia,

19 and that the government has made it clear and unequivocal that

20 it intends to deport her to Russia unless she is granted asylum

21 and that it will not allow her to depart to another country

22 where she will be safe and where she has legitimate immigration

23 status.

24      She has also raised a substantial question regarding

25 whether her current detention is the product of a process that

1   has nothing to do with the merits of this case. She is in the

2   process, under a Freedom of Information Act claim, to try to

3   find out if there is a retaliatory purpose behind what has

4   happened to her.

5       If Ms. Petrova's bail is not considered by this court,

6   there will be no determination by an immigration judge that any

7   constitutional rights were violated or that she has been

8   subject to a violation of the APA.

9       The Court further finds that bail is necessary to make the

10   habeas remedy effective in this case because release from

11   detention and ICE custody is the relief sought. The district

12   court in the Western District of New York reached this same

13   conclusion in *D'Alesandro v. Mukasey*, and the United States

14   Supreme Court has ruled in *Demore v. King -- Kim* that the

15   detention during a removal proceeding is a constitutionally

16   permissible part of the process. No court has apparently ruled

17   that this principle applies even when the removal proceedings

18   are undertaken for an unlawful or arbitrary and capricious

19   reason by an immigration officer without authority to revoke a

20   visa and set the process in motion.

21       The Court therefore finds by clear and convincing evidence

22   that Ms. Petrova is neither a danger to the safety of the

23   community or a risk of nonappearance that cannot be addressed

24   through appropriate conditions of release and hereby grants her

25   release from ICE/HSI custody under *Mapp v. Reno*. The

1  government may propose conditions of release at this time.

2       Although the Court is reluctant to enjoin an executive

3  agency from undertaking future actions which are uncertain, it

4  relies on the representation from the government's attorney

5  that there is no intention at this time to rearrest Ms. Petrova

6  if she is released by this court and by the District of

7  Massachusetts as well notwithstanding the ICE detainer.

8       I'm going to now turn to you, Mr. Hartman, and ask if you

9  are requesting any particular conditions of release or you

10  defer to the District of Massachusetts and ask this court to

11  await any conditions of release or that determination, because

12  obviously if the District of Massachusetts decides to detain

13  Ms. Petrova, she will remain in U.S. Marshals' custody.

14       MR. HARTMAN:  Thank you, Your Honor.

15       The government would request the ability to file just a

16  short brief in the next day or two to address the appropriate

17  conditions so I can consult with my clients and identify what

18  conditions they believe are necessary to ameliorate the risk of

19  flight.  And our view is that won't prejudice Ms. Petrova

20  because she's currently in criminal custody, and so I think the

21  brief -- or the government can file its brief with plenty of

22  time for the Court to address that prior to --

23       THE COURT:  You have represented she will not -- be

24  transported to the District of Massachusetts no sooner than

25  May 30th, so when do you want to file that?

1          MR. HARTMAN:  The 30th, if that would be amenable to

2    Your Honor.

3          THE COURT:  Any objection to that?

4          MR. ROMANOVSKY:  No, Your Honor.  We do not expect

5    Ms. Petrova's criminal bail hearing to take place until next

6    week, so May 30th would be fine with us.

7          THE COURT:  All right.  And has it been set for a

8    date?

9          MR. ROMANOVSKY:  Not yet, Your Honor.

10         THE COURT:  Okay.  Anything further in this matter?

11         MR. ROMANOVSKY:  Not from us, Your Honor.

12         MR. HARTMAN:  Sorry, Your Honor.  Just a quick

13   clarifying question on the amended petition.  Does that

14   encompass the four -- three or four FOIA claims?

15         THE COURT:  It does.  I opined that I've never seen a

16   habeas petition for FOIA reasons.  I don't know that that will

17   be available relief that I could -- as we know, habeas

18   effectively says bring the body to me and I will decide whether

19   or not the person is unlawfully detained.  I've never seen it

20   interact with a FOIA request, so that's novel to me.  I

21   expected you would want to brief on that and that I was going

22   to give Mr. Romanovsky an opportunity to respond.

23         MR. HARTMAN:  Thank you, Your Honor.

24         THE COURT:  All right.

25         (Court was in recess at 11:51 AM.)

1                    C E R T I F I C A T I O N

2        I certify that the foregoing is a correct transcript from

3    the record of proceedings in the above-entitled matter.

4

5

6    May 28, 2025                    _____

7                                        Johanna Massé, RMR, CRR

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25