UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,          )
                                   )
                 Plaintiff         )
                                   )   No. 1:25-mj-05150-JGD-1
vs.                                )
                                   )
KSENIIA PETROVA,                   )
                                   )
                 Defendant.        )
                                   )
                                   )
                                   )



            BEFORE THE HONORABLE JUDITH G. DEIN
               UNITED STATES MAGISTRATE JUDGE
                    PRELIMINARY HEARING
                    (Digital Recording)




         John Joseph Moakley United States Courthouse
                      Courtroom No. 15
                     One Courthouse Way
                  Boston, Massachusetts 02210


                       June 18, 2025
                         3:30 p.m.




               Kristin M. Kelley, RPR, CRR
                  Official Court Reporter
         John Joseph Moakley United States Courthouse
                One Courthouse Way, Room 3209
                  Boston, Massachusetts 02210
                  E-mail: kmob929@gmail.com

         Mechanical Steno - Computer-Aided Transcript

```
 1    APPEARANCES:

 2

 3            Nadine Pellegrini
              David M. Holcomb
 4            United States Attorney's Office
              John Joseph Moakley Federal Courthouse
 5            1 Courthouse Way
              Suite 9200
 6            Boston, MA 02210
              617-748-3261
 7            nadine.pellegrini@usdoj.gov
              David.Holcomb@usdoj.gov
 8            for Plaintiff.

 9

10            William W. Fick
              Daniel N. Marx
11            Fick & Marx LLP
              24 Federal Street, 4th Flr.
12            Boston, MA 02110
              857-321-8360
13            wfick@fickmarx.com
              dmarx@fickmarx.com
14            for Defendant.

15

16

17

18

19

20

21

22    ** Proceedings recorded by sound recording and produced by
      computer-aided stenography. **
23

24

25
```

```
  1                    P R O C E E D I N G S
  2            THE CLERK:  All rise.
  3            (The Honorable Court entered.)
  4            THE CLERK:  You may be seated.
  5            The United States District Court for the District of
  6    Massachusetts is now in session on June 18th, the year 2025, in
  7    the matter of the United States of America versus Kseniia
  8    Petrova, Criminal Case No. 2505150.
  9            Would counsel please introduce themselves for the
 10    record.
 11            MR. HOLCOMB:  Good afternoon, your Honor.  David
 12    Holcomb and Nadine Pellegrini for the United States.
 13            MS. PELLEGRINI:  Good afternoon, your Honor.
 14            MR. FICK:  Good afternoon.  William Fick and Daniel
 15    Marx for Kseniia Petrova.
 16            THE COURT:  Welcome, everyone.  So we're scheduled for
 17    a probable cause hearing.  Is everybody ready to proceed?
 18            MR. FICK:  Yes, your Honor.
 19            THE COURT:  How are we proceeding?
 20            MR. HOLCOMB:  The government has a witness to call.
 21    The government calls Special Agent Brian Goldsworthy.
 22            Your Honor, may I place the exhibits I intend to offer
 23    on the exhibit stand?
 24            THE COURT:  Is there any objection?
 25            MR. FICK:  For the purpose of this hearing, your
```

```
 1  Honor, there is no objection.
 2          THE COURT:  Thank you.
 3               BRIAN GOLDSWORTHY, sworn.
 4          THE CLERK:  Can you please state your name for the
08:45 5  record, spelling your last name.
 6          THE WITNESS:  Sure.  Brian Goldsworthy,
 7  G-O-L-D-S-W-O-R-T-H-Y.
 8          THE COURT:  Thank you.
 9  DIRECT EXAMINATION BY MR. HOLCOMB:
08:46 10 Q.   Good afternoon, Special Agent.
 11 A.   Good afternoon.
 12 Q.   Special Agent Goldsworthy, where are you employed?
 13 A.   Special Agent with Homeland Security Special
 14 Investigations in Boston.
08:46 15 Q.   When did you join Homeland Security Investigations?
 16 A.   2007.
 17 Q.   And may I call it HSI?
 18 A.   Yes.
 19 Q.   Okay.  Can you briefly describe what HSI does?
08:46 20 A.   Sure.  Homeland Security Investigations is the
 21 investigative arm for the Department of Homeland Security.  We
 22 investigate a broad variety --
 23          THE COURT:  Can you hold for one second?  Can you try
 24 to make this louder for me?  Go ahead.  You're done?  I'm just
08:47 25 trying to -- this is a new audio system.  I'm trying to figure
```

1    out what I can hear.  Okay.  Go ahead.

2              MR. HOLCOMB:  Can I proceed?

3              THE COURT:  Thank you.

4    Q.    Special Agent, I believe you were telling us what Homeland

08:48  5    Security Investigations or HSI does?

6    A.    Yes.  We're the investigative agency with the Department

7    of Homeland Security.

8    Q.    And can you briefly describe your training and experience

9    as an HSI Special Agent?

08:48  10    A.    Sure.  I began as a United States Customs Inspector in

11    1999, and the last 18 years I was with Homeland Security

12    Investigations.  I've attended several national academies at

13    the Federal Law Enforcement Training Center and in additional

14    in-service training.

08:48  15    Q.    Generally, what kind of cases have you worked on?

16    A.    I'm currently assigned to the National Security Group at

17    our office, mostly Joint Terrorism Task Force investigations,

18    as well as counter-proliferation investigations and illegal

19    importation and exportation of goods from the U.S.

08:49  20    Q.    Thank you.

21              I've placed a binder in front of you.  Can you please

22    open to Tab 1.

23    A.    Yes.

24              THE COURT:  I guess we should just admit all of these.

08:49  25    Does that make sense if there's no objection?

1          MR. FICK:  No objection.

2          MR. HOLCOMB:  Move to admit all of them, your Honor.

3          THE COURT:  Yes.  One through 5, if you would just

4     identify them.

08:49 5          MR. HOLCOMB:  Yes.

6          (Exhibits 1-5 admitted into evidence.)

7     Q.    Special Agent, this is marked as Exhibit 1.  What is this?

8     Are you familiar with this document?

9     A.    Yes, I am.

08:49 10    Q.    And what is this?

11    A.    This is the criminal complaint, affidavit.

12    Q.    Specifically, this is an affidavit in support of a

13    criminal complaint against whom?

14    A.    The defendant, Kseniia Petrova.

08:49 15    Q.    And what offense, what criminal offense does the complaint

16    charge?

17    A.    Smuggling.

18    Q.    Can you tell us about your involvement in the

19    investigation of Ms. Petrova?

08:50 20    A.    Yes.  I received an investigative referral and opened up a

21    criminal investigation based on the encounter at Logan Airport

22    February 16th.

23    Q.    And I'll ask you more about that in a moment.

24          Where does the information in this affidavit come

08:50 25    from generally?

```
       1   A.    Generally, it's from law enforcement reports, interviews

       2   with other law enforcement officers and other investigative

       3   steps.

       4   Q.    And did you -- and just at a high level for now, you

08:50  5   mentioned smuggling.  What specifically does this complaint

       6   affidavit allege that Ms. Petrova did?

       7   A.    It alleges that the defendant smuggled in material to the

       8   United States without declaring them to Customs.

       9   Q.    And did you review this affidavit in advance of your

08:50 10   testimony today?

      11   A.    Yes, I did.

      12   Q.    Is the information contained in this affidavit accurate to

      13   the best of your knowledge and belief?

      14   A.    Yes.

08:50 15   Q.    I'm going to take this down for now.

      16         Before asking you more about the complaint affidavit,

      17   I want to ask you questions about the Customs process.  You

      18   mentioned -- I believe you mentioned Customs and Border

      19   Protection.  What is CBP?

08:51 20   A.    It's basically the first -- it's the Customs agency, the

      21   uniformed personnel at the airport, seaport, land border that

      22   you would encounter when entering or exiting the United States.

      23   Q.    And, generally, what does CBP do?

      24   A.    They enforce the Customs laws and Immigrations laws to

08:52 25   determine Customs regulations and the Immigration regulations
```

1  with regard to entry into the United States.

2  Q.   So when an individual enters the United States, do they go

3  through a Customs process?

4  A.   Yes.

08:52  5  Q.   Could you tell us a bit about that process?

6  A.   Sure.  So specifically at an airport environment,

7  passengers arrive from foreign -- they deboard the jet craft

8  and jet way and the first, at Boston, the first place that they

9  would go is a large Customs area, Immigration hall on the same

08:52  10  level.  And it's also referred to as Customs Primary or

11  Passport Control.

12       At some point, they move to the next step, which is

13  downstairs in the Customs area where the baggage carousels are.

14  And then also co-located by the exit would be Customs

08:53  15  Secondary.  There's Immigration Secondary in there and there's

16  Agriculture Inspection area to the left as you're exiting the

17  airport.

18  Q.   Just to back up, you're describing physical locations.

19  Are you describing a specific facility?

08:53  20  A.   Yes, Logan International Airport.

21  Q.   Thank you.

22       Now, if an individual is entering the United States

23  and bringing something in for the first time, is there anything

24  that that individual's supposed to do?

08:53  25  A.   Yes.  If something's entering the United States for the

first time or if it's going to stay in the U.S., then yes.
They need to be declared.

Q.    And how does an individual -- how is an individual
required to declare something that they're bringing into the
country?

A.    They're required to declare them to a Customs officer.

Q.    Are there ways that these individuals entering the country
are made aware of the declaration requirement?

A.    Yes.    There's signage.    CBP as a whole, has a whole
program about traveling, "Know Before You Go" campaign.
There's also signage at the airport, multiple locations.    Then
there's television screens that rotate a message about the
Customs process.

Q.    Okay.    And where specifically are individuals supposed to
declare an object that they're bringing into the country?

A.    To the -- to the first Customs officer that they would
encounter.

Q.    I believe you called that Primary Inspection, is that
correct?

A.    Correct.

Q.    And Primary Inspection, is that the first booth that many
people are familiar with when they go through the Customs
process?

A.    Yes.

Q.    You also mentioned Secondary.    Can you explain what

1    Secondary Inspections are?

2    A.    Sure.   In Primary or the Passport Control booth, one can

3    refer to Immigration Secondary.   For example, someone that

4    would be immigrating to the United States.   They could also be

08:54  5    referring to Customs Secondary for an enforcement search or

6    they could be referred to Agriculture based on the declaration

7    being food or plants' products.   They could be a referral there

8    or it could just be you're admitted and you proceed to the next

9    step on your own.

08:55 10    Q.    And if somebody is detected with having brought in

11    something that CBP wants to know more about, for instance, is

12    that another grounds for calling them over to Secondary?

13    A.    Yes.   You could also be sent to Secondary from the baggage

14    belt or anywhere along in the process.

08:55 15    Q.    Now, is HSI at all involved in this Customs process?

16    A.    So we are not part of that process but we are there as an

17    investigative entity.

18    Q.    At what point does HSI become involved in?

19    A.    If it's a referral, if a duty agent gets a phone call or

08:55 20    there's a referral from CBP or we become aware of something

21    that needs to be investigated, then we would -- that would fall

22    into our purview.

23    Q.    And once HSI receives a referral, what typically happens?

24    A.    We would open a criminal case if it was warranted.

08:55 25    Q.    Now I want to ask you about specific allegations in the

1    complaint affidavit, so going back to the document marked as

2    Exhibit 1.  I'd ask you to turn to page 2, please.

3            And paragraph 3 states "I submit this affidavit in

4    support of a criminal complaint charging Kseniia Petrova", I'm

08:56  5    just shortening it here, with smuggling goods in violation of

6    18 United States Code Section 545.  As set forth below, there

7    is probable cause to believe that on or about February 16,

8    2025, Petrova, in the District of Massachusetts, fraudulently

9    and knowingly imported and brought into the United States

08:56 10    merchandise contrary to law, to whit, biological specimens,

11    including multiple clawed frog embryos and embryonic samples in

12    paraffin well stages and on mounted dyed slides.

13            Special Agent, is that an accurate summary of the

14    investigation's findings?

08:56 15    A.   Yes.

16    Q.   Can I direct your attention to the next page, please,

17    paragraph 6.  The affidavit describes, beginning on

18    paragraph 6, it describes Ms. Petrova's arrival to Logan

19    Airport and interactions with CBP, is that correct?

08:57 20    A.   Yes.

21    Q.   Can you tell us where this information from your affidavit

22    generally comes from?

23    A.   The information came from Customs and Border Protection

24    reports.

08:57 25    Q.   All right.  What is Ms. Petrova's citizenship?

1    A.    She's a Russian citizen.

2    Q.    Did she live in the United States?

3    A.    Yes.

4    Q.    Based on the investigation, what was she doing in the

08:57  5    United States?

6    A.    A researcher on a J-1 visa, a scientific researcher.

7    Q.    And on February 16, 2025, where was it that she was

8    traveling from?

9    A.    From -- she arrived from Paris, France.

08:57 10    Q.    Had she traveled to other countries on the same trip

11    outside the United States?

12    A.    Yes.

13    Q.    Do you recall how many others?

14    A.    I believe there was six total.

08:58 15    Q.    Okay.  When she returned to the United States on

16    February 16th, where did she arrive?

17    A.    She arrived in Terminal E in Boston.

18    Q.    Okay.  I'm going to take this down for a moment and ask

19    you about Ms. Petrova's interactions with Customs and Border

08:58 20    Protection officials.  Okay?

21    A.    Okay.

22    Q.    Have you reviewed a videotape of Ms. Petrova's primary

23    inspection?

24    A.    Yes.

08:58 25    Q.    And, again, this was her first encounter with a CBP

1    official, correct?

2    A.    Correct.

3    Q.    Now, can you describe for us that interaction?

4    A.    Sure.  So that's the first encounter with Customs.  There

08:58  5    was an officer in the booth.  As she entered the booth, he

6    asked questions about "Where are you coming from?"  The

7    defendant stated "France."

8              THE COURT:  Let me pause you there.

9    A.    Sure.

08:59  10    Q.    Did the CBP officer ask any follow-up questions?

11    A.    Yes.

12    Q.    To the question specifically of where did you travel from,

13    what did they ask?

14    A.    So "Where did you come from?"  "France."  The officer

08:59  15    asked, "Any other countries?"

16    Q.    How did Ms. Petrova respond?

17    A.    No.

18    Q.    Is it accurate that she said just France?

19    A.    That was not accurate.  It is accurate that she said it,

08:59  20    yes.

21    Q.    Okay, but was it accurate that she had only traveled to

22    France?

23    A.    No.

24    Q.    What other questions did the primary officer ask her?

08:59  25    A.    The officer asked if she had any food.

1    Q.   How did she answer?

2    A.   No.

3    Q.   And was that accurate?

4    A.   She said no.  Yes.  It was not accurate.

08:59  5    Q.   And why was that not accurate?

6    A.   She had beef and pork and fruits.

7    Q.   Now, it was at that point, that primary inspection, that

8    she was supposed to declare anything she brought into the

9    country, correct?

09:00 10    A.   That's correct.

11    Q.   Did she at that point declare bringing anything into the

12    country?

13    A.   No.

14    Q.   I'll direct your attention to paragraph 7 of the

09:00 15    affidavit, which states that "Upon her arrival at Logan,

16    Petrova's checked luggage - a duffle bag - was placed on a

17    baggage carousel.  There, a Customs and Border Protection

18    canine alerted his handler to Petrova's bag.  Per protocol, the

19    CBP officer removed the bag from the carousel and brought it to

09:00 20    an agricultural secondary inspection area for further

21    screening.  There, a CBP officer inspected the contents of the

22    bag and discovered the biological items".

23         Is that an accurate description of what happened

24    after her primary inspection?

09:00 25    A.   Yes.

Q.   Do you know why the canine flagged her checked bag?

      Well, first off, let me ask you.  Can you describe exactly what the canine was used for?

A.   Yes.  The canine is part of the Beagle Brigade for Customs and Border Protection and they're trained to detect food products:  Meat, plants, vegetables, fruit.

Q.   And just to be clear, the canine is an actual dog, correct?

A.   Correct.

Q.   Do you know why the canine detected or flagged Ms. Petrova's bag?

A.   I was informed by the handler that it was the -- the canine alerted to the food products in the bag.

Q.   Now, the affidavit states that the bag was removed from the Secondary inspection area.  Where physically was this area?

A.   So there's a very large Customs hall with several baggage carousels, and the bag went from the carousel to the Agriculture area, which is prior to the exit of the Customs hall on the left-hand side, very close, within eyesight of the belts.

Q.   And at that point the bag was inspected?

A.   Yes.

Q.   Who inspected the bag?

A.   The CBP Agricultural Specialist, the canine officer.

Q.   Paragraph 8 of the affidavit states that she was asked to

1    present herself at the Secondary inspection area.  She was

2    wearing a backpack and carrying a plastic bag.  Let me pause

3    there.

4              Did you speak to the CBP officer about this, these

09:05  5    events?

6    A.    Yes, I did.

7    Q.    Can you describe what you learned about these events?

8    A.    Yes.  The CBP canine officer discovered the biological

9    specimens material with the fruit and the meat and he paged the

09:05 10    defendant on the loud speaker, but there was no response.  So

11    he described that he got her photograph from Primary and

12    located her and approached her at that point.

13    Q.    Okay.  So did she -- you said there was no response.  Her

14    name was being called on the loud speaker, is that correct?

09:05 15    A.    Yes.

16    Q.    Okay.  Where was she actually located?

17    A.    She was located in the baggage carousel area.

18    Q.    And that was only after an officer located her by using

19    her photograph, is that correct?

09:05 20    A.    That is correct.

21    Q.    And what was she carrying on her at that point?

22    A.    I believe it was a smaller bag and a plastic bag.

23    Q.    All right.  Back to paragraph 8.  The affidavit says "When

24    questioned about her luggage, Petrova denied carrying any

09:06 25    biological material.  When the CBP officer asked her again,

1  Petrova identified the plastic bag she was carrying as having

2  biological material".

3          I'll pause there.  Did you discuss with the CBP

4  officer this interaction?

09:06 5  A.   Yes.

6  Q.   Can you describe it for us?

7  A.   Yes.  He told me that he asked Petrova, "Are you traveling

8  with any biological materials," and she stated, "No."  And he

9  asked her a second time, "Are you sure," at which point she

09:06 10  indicated that she handed the plastic bag or indicated that

11  there was something in the plastic bag.

12  Q.   At this time did she say anything about her checked

13  luggage?

14  A.   Not that I know of.

09:07 15  Q.   All right.  Paragraph 8 continues by stating that "An

16  inspection of the bag revealed a foam box containing frog

17  embryos in microcentrifuges, as well as embryo slides".

18          That was the bag she was carrying, correct?

19  A.   Correct.

09:07 20  Q.   "A CBP officer interviewed Petrova under oath and

21  conducted a manual review of her cellphone".

22          Let me ask you more about that in a moment.  First

23  though, Special Agent, were there photographs taken of the

24  biological terms that CBP officers found?

09:07 25  A.   Yes.

1    Q.    Can I ask you to turn to Tab 2, please.  Are you familiar

2    with these?

3    A.    Yes.

4    Q.    What are they?

09:10    5    A.    Those are the photographs of the material that the

6    defendant was carrying.

7    Q.    And I'm just going to slowly flip through these so we can

8    look at them together.  I'll ask you to do the same, please.

9          Generally, what is it that we're looking at?

09:10    10    A.    It's frog embryos in different containers.

11    Q.    Are these all photographs of materials that were found

12    either in her plastic bag that she was carrying or in her

13    checked luggage?

14    A.    Yes.

09:11    15    Q.    This is the last one.  Did you obtain these photographs

16    from CBP?

17    A.    Correct.

18    Q.    Okay.  Thank you.

19          Back to the affidavit, Special Agent.  Back to

09:11    20    paragraph 8.  The section I just read stated that the CBP

21    officer interviewed Petrova under oath.  Are you aware of any

22    record of that interview?

23    A.    Yes.

24    Q.    Could I ask you to turn to Tab 3 now.  This is marked as

09:11    25    Exhibit 3?

|        |    |                                                                         |
|--------|----|-------------------------------------------------------------------------|
|        | 1  | A.    Yes.                                                               |
|        | 2  | Q.    Special Agent, are you familiar with this document?               |
|        | 3  | A.    Yes, I am.                                                         |
|        | 4  | Q.    And what is it?                                                    |
| 09:11  | 5  | A.    It's a sworn statement for immigration proceedings.               |
|        | 6  | Q.    Is this a standard form that is completed for this type of        |
|        | 7  | interaction?                                                            |
|        | 8  | A.    Yes.                                                               |
|        | 9  | Q.    And what is the purpose of the form?                              |
| 09:12  | 10 | A.    The form is to reflect an immigration record for use in           |
|        | 11 | administrative immigration proceedings, typically for removal.          |
|        | 12 | Q.    And, Special Agent, beginning halfway down the page, do           |
|        | 13 | you see there are Qs and As for questions and answers?                  |
|        | 14 | A.    Yes.                                                               |
| 09:12  | 15 | Q.    Is this a record of the actual questions and answers that         |
|        | 16 | were asked -- were asked of and the answers that were given            |
|        | 17 | during this interaction -- during this interview?                       |
|        | 18 | A.    Yes.                                                               |
|        | 19 | Q.    Okay.  Toward the bottom of the first page, do you see            |
| 09:12  | 20 | here -- I don't know if that screen is working.  Can you see            |
|        | 21 | where my finger is pointing?                                            |
|        | 22 | A.    Yes, I can.                                                        |
|        | 23 | Q.    How did Ms. Petrova answer the question "Are you                   |
|        | 24 | comfortable conducting this statement in the English language?"         |
| 09:13  | 25 | A.    She said, "Yes."                                                   |

```
         1   Q.   Based on your conversations with CBP, was there any
         2   indication that Ms. Petrova was having a hard time
         3   understanding English or could have benefitted from a
         4   translator?
09:13    5   A.   No.
         6   Q.   Why?  How do you know that?
         7   A.   Everything that I've seen was in English.  Conversations
         8   that she had were in English.
         9   Q.   On page 3, if I can have you fast forward to page 3
09:13   10   here --
        11   A.   Yes.
        12   Q.   -- do you see the -- excuse me just a second.
        13        Do you see where my finger points to the question
        14   "What is the purpose of your travel today?"
09:13   15   A.   Yes.
        16   Q.   How did Ms. Petrova respond?
        17   A.   "I am coming back home.  I live here and I work here."
        18   Q.   How does she respond to the question where do you work?
        19   A.   "Harvard Medical School."
09:14   20   Q.   How does she respond to "What do you do at Harvard?"
        21   A.   "I am a research assistant."
        22   Q.   And she was asked "What do you do researching?"  How did
        23   she respond?
        24   A.   "Biology."
09:14   25   Q.   Now, the next question that was asked of her was, "You
```

|    |    |    |
|----|----|----|

1    were asked by the primary officer if you were traveling with

2    any biological material.  You stated no.  Do you understand?"

3              Do you see that?

4    A.    I do.

09:14  5    Q.    Do you understand her answer was "Yes"?

6    A.    I do.

7    Q.    Now, based on the investigation, is this exchange

8    accurate?

9    A.    It is not.

09:14  10    Q.    Could you please explain why for us?

11    A.    I reviewed the video from primary inspection and that

12    question was not, in fact, asked.

13    Q.    Is that a question that the -- the question about

14    biological material, is that a specific question that the

09:14  15    primary officer would typically ask?

16    A.    In -- not always.  However, a J-1 visa holder, a

17    researcher, that would be a typical question that they would

18    ask.  It is unclear why that wasn't asked, but it would be a

19    typical question for someone in that field.

09:15  20    Q.    In any event though, it's not always -- that specific

21    question is not always asked at the primary stage?

22    A.    That is correct.

23    Q.    In fact, the primary officers don't ask about every type

24    of material that could be brought in, correct?

09:15  25    A.    Correct.

Q.   Now, the next question though, do you see where it asks,
"You were asked by an agricultural specialist if you were
traveling with any biological material.  You stated no.  Do you
understand?"

          How did she respond?

A.   "Yes."

          THE COURT:  My Exhibit 3 ends there.  We're moving on
to Exhibit 4?

          MR. HOLCOMB:  No, your Honor.  It should be page 4 of
Exhibit 3.

          THE COURT:  I only have page 3.  Thank you.  You can
continue.

          MR. HOLCOMB:  Thank you, your Honor.

Q.   Special Agent, you were asked about her answer to the
question of whether an Agricultural Specialist had asked her if
she was carrying biological material and that she stated "No."

     "Do you understand?"

          How did she answer?

A.   "Yes".

Q.   To be clear, that was in response to the question "Do you
understand?"

A.   Correct.

Q.   Now, based on the investigation, is that an accurate
description of her interaction with the CBP Agricultural
Specialist?

A.    Yes.

Q.    Next she was asked:  "The Agricultural Specialist found a Styrofoam box with biologicals as well as and loose biologicals in multiple Ziploc bags in your duffle bag, is this correct?"

09:17              And how did she respond?

A.    "Yes."

Q.    The next question was:  "Did you pack the biological contents into your duffle bag and Styrofoam box?"

              How did she respond?

09:17 A.    "Yes."

Q.    The next question was:  "Can you describe what type of biological material you placed in your duffle bag?"

              How did she respond?

A.    "Fixed and embedded frog embryos."

09:17 Q.    The next question was:  "Is this biological material from a laboratory?"  How did she respond?

A.    "Yes."

Q.    "What laboratory is this biological material from?"

              How did she respond?

09:17 A.    "Anne Helene Monsoro Burq and Medical Institute in Paris."

Q.    She was asked:  "Why did you bring this biological material to the United States?"  How did she respond?

A.    It says:  "To (long pause) finish our experiment."

Q.    She was asked:  "What is the experiment you were trying to

09:17 finish?"  How did she respond?

1    A.    "Spatial transcriptomics."

2    Q.    Let me just skip ahead.  She was asked:  "Did you know

3    that you were supposed to declare biological material when

4    entering the United States?"

5             How did she respond?

6    A.    It says:  "Umm (long pause) I was not sure."

7    Q.    Let me come back to this.  I'll skip ahead to the next

8    page, Special Agent.

9             Actually, I'm sorry, the bottom of page 4 she was

10   asked again.  "I'll ask the question again.  Do you know that

11   you were supposed to declare biological material when entering

12   the United States?"

13            How did she respond to that?

14   A.    "I was not sure about embryos specifically."

15   Q.    I'm going to flip back to the affidavit briefly, Special

16   Agent, paragraph 8 again.  It stated that she was interviewed

17   under oath and that CBP conducted a manual review of her

18   cellphone, correct?

19   A.    Yes.

20   Q.    And this sworn statement shows that she was asked about

21   some of the messages found during that manual review, is that

22   correct?

23   A.    Yes.

24   Q.    For example, in, back to Exhibit 4 -- excuse me -- three,

25   if you will, Special Agent.

1           At the bottom of page 4, do you see where she is

2    asked, question, "Who is Will Trim?"

3    A.    Yes.

4    Q.    How did she answer?

09:19 5    A.    "(Long pause) my colleague."

6    Q.    And then she was asked:  "A text message from Will Trim

7    states, 'if you bring samples or antibody back, make sure you

8    get the permissions, et cetera, like that link I sent to

9    Leon/group chat about frog embryos because TSA went through my

09:19 10   bags at Customs in Boston'.  Do you understand?"

11           How did she respond to that?

12   A.    "Yes."

13   Q.    She was asked:  "Did you have a permit issued by the

14   United States government that would allow you to import this

09:20 15   biological material?"

16           How did she respond?

17   A.    "No."

18   Q.    And, Special Agent, stepping back from the sworn

19   statement, are you aware, based on the investigation, of any

09:20 20   step that Ms. Petrova took to get permission of the type that

21   may be referenced in this chat?

22   A.    No.

23   Q.    And on the last page, do you see where she is asked,

24   question, "Who is Leon Peshkin?"

09:20 25   A.    Yes.

```
 1   Q.   How did she respond?

 2   A.   "My principal investigator."

 3   Q.   And here it asks:  "A text message from Leon Peshkin

 4   states 'What is your plan for getting through U.S. Customs with

 5   samples?'  Do you understand?"

 6        How did she respond?

 7   A.   "Yes."

 8   Q.   And then she was asked:  "Your response back to Leon

 9   Peshkin states 'no plan yet'," and then a bunch of numbers, "'I

10   won't be able to swallow them'," bunch of numbers.  I believe

11   that might be in error.  "Do you understand?"

12        Do you see that?

13   A.   Yes.

14   Q.   And what is her recorded response here?

15   A.   It says in parentheses "laughs for a minute, yes".

16   Q.   Okay.  I'm going to ask you to turn to Exhibit 4 in a

17   moment but, first, have you separately reviewed certain of the

18   messages between Ms. Petrova and either Will Trim or Leon

19   Peshkin?

20   A.   Yes.

21   Q.   I'm showing you Exhibit 4.  This is Tab 4.  Are these a

22   selection of messages with Mr. Trim?

23   A.   Yes.

24   Q.   And are these from Mr. Trim's phone?

25   A.   Yes.
```

09:20 5
09:21 10
09:21 15
09:21 20
09:22 25

```
 1    Q.    Who does it say they're to at the top here?

 2    A.    It says "Kseniia Petrova".

 3    Q.    And on the first page here, what is the time, the date

 4    stamp?

 5    A.    Where?

 6    Q.    At the very bottom.

 7    A.    Okay.  So February 13th.

 8    Q.    Is that February 13, 2025?

 9    A.    Correct.

10    Q.    So this was 3 days before Ms. Petrova's reentry to the

11    United States?

12    A.    Yes.

13    Q.    Could I ask you to flip to the fourth page of this

14    exhibit?  Do you see where my finger is pointing to?

15    A.    Yes.

16    Q.    Is this the text message that was quoted in the sworn

17    statement in which he says "if you bring samples or antibody

18    back, make sure you get the permissions, et cetera"?

19    A.    Yes.

20    Q.    And I'll ask you to turn to Exhibit 5 now.  Now, what are

21    these images from?

22    A.    This is an image that was taken by CBP of Ms. Petrova's

23    phone.

24    Q.    So this was taken while CBP did its manual review of her

25    phone on February 16, is that correct?
```

|   |   |
|---|---|
| 1 | A.   That is correct. |
| 2 | Q.   And who does it say the messages are with? |
| 3 | A.   Leon Peshkin. |
| 4 | Q.   What language are these messages in? |
| 09:23  5 | A.   Appears to be Russian. |
| 6 | Q.   Did you take any steps to conduct just a preliminary |
| 7 | review of these messages? |
| 8 | A.   Yes. |
| 9 | Q.   What did you do? |
| 09:23  10 | A.   Just a computer translation. |
| 11 | Q.   Are the computer translation tools -- first, which one did |
| 12 | you use? |
| 13 | A.   Google. |
| 14 | Q.   Are these tools 100 percent accurate? |
| 09:23  15 | A.   I would doubt it. |
| 16 | Q.   And do they -- do they come up with elegant translations |
| 17 | like an actual linguist would actually come up with? |
| 18 | A.   Probably not. |
| 19 | Q.   But is this a tool that investigators sometimes use to |
| 09:24  20 | just get an initial sense of what is discussed in the |
| 21 | conversation? |
| 22 | A.   Yes. |
| 23 | Q.   Okay.  I'm going to ask you to turn to the next page here. |
| 24 | Can you tell us what we're looking at here? |
| 09:24  25 | A.   Yes.  It's like a Google translated screenshot. |

1   Q.   Of those same messages with Mr. Peshkin?

2   A.   Yes, correct.

3   Q.   Okay.  And, Special Agent, are these messages from

4   February 16th?

09:24  5   A.   Yes.

6   Q.   You see midway through the translation it states "I'm a

7   little late at the airport"?

8   A.   Correct.

9   Q.   To be clear, the messages on the right are from

09:24 10  Ms. Petrova, correct?

11   A.   Yes.

12   Q.   Could I ask you to flip to the next page.  Do you see here

13  the translation reads "I'm going to the gate but I haven't been

14  checked yet"?

09:24 15  A.   Correct.

16   Q.   "And I have samples on the ice", smiley face?

17   A.   Yes.

18   Q.   Do you see where down here she says "Charles de Gaulle is

19  huge"?

09:25 20  A.   Yes.

21   Q.   Was she flying from Charles de Gaulle Airport in Paris?

22   A.   Correct.

23   Q.   Do you see that the translation of Leon Peshkin's text

24  here says "bypassing the queue... not checking the luggage",

09:25 25  exclamation point?

A.    Yes.

Q.    Could you please flip to the next page.  Do you see where Ms. Petrova says:  "I made it"?

A.    Yes.

Q.    She says:  "I was panicking for nothing".  And she says: "The samples didn't even notice"?

A.    Correct.

Q.    Can you please read the translations of the next two messages from Mr. Peshkin?

A.    Yes.  It says:  "What is your plan to pass the American Customs with samples?  This is the most delicate place of the trajectory".

Q.    The next message from Ms. Petrova or translation is "at least I landed", correct?

A.    Correct.

Q.    Now, is this where the messages from -- as photographed by CBP ended?

A.    Yes.

Q.    As provided to you?

A.    Correct.

Q.    However, did you discuss with CBP their review of the messages?

A.    Correct.

Q.    And we just read from the sworn statement an additional message that Ms. Petrova acknowledged, correct?

|    |    |
|----|----|
| 1 | A.    Correct. |
| 2 | Q.    That message was "I'm back on" -- Exhibit 3 now, page 5. |
| 3 | "What is your plan for getting through U.S. Customs with |
| 4 | samples?"  And the response was:  "No plan yet.  I won't be |
| 09:26  5 | able to swallow them". |
| 6 |         Is that correct? |
| 7 | A.    Correct. |
| 8 | Q.    So going back to the end of the messages in Exhibit 5, |
| 9 | what's your understanding of when the messages that we just |
| 09:26  10 | quoted from the sworn statement were exchanged? |
| 11 | A.    Immediately following that. |
| 12 |         THE COURT:  I'm sorry.  Say that again. |
| 13 |         THE WITNESS:  Immediately following that. |
| 14 |         THE COURT:  Thank you. |
| 09:27  15 | Q.    And this was immediately after Ms. Petrova -- at least the |
| 16 | message translation states "At least I landed"? |
| 17 | A.    Correct. |
| 18 | Q.    I'll just refer you back to the complaint affidavit.  The |
| 19 | rest of paragraph 8, Special Agent, summarizes the sworn |
| 09:27  20 | statement and the messages we just looked at, correct? |
| 21 | A.    Correct. |
| 22 | Q.    As well as paragraph 9, which is the message about this |
| 23 | being the most delicate place of trajectory, correct? |
| 24 | A.    Correct. |
| 09:27  25 | Q.    As well as paragraph 10, this being the message "I won't |

1    be able to swallow them", correct?

2    A.    Correct.

3    Q.    All right.  Last, with respect to the affidavit, could I

4    please have you look at paragraph 13, which states "The

09:28  5    biological items found on Petrova's possession and in her

6    checked bag were examined by the National Bioforensic Analysis

7    Center (NBFAC) and it was determined items contained clawed

8    frog (Xenopus tropicalis and Xenopus laevis) embryos and

9    embryonic samples, among other things", correct?

09:28 10    A.    Yes.

11    Q.    What is the National Bioforensic Analysis Center?

12    A.    It's a government laboratory housed in Fort Detrick,

13    Maryland, and it assists federal law enforcement with criminal

14    investigations with biological material.

09:28 15    Q.    Were the biological materials that were found in

16    Ms. Petrova's bag sent to that lab?

17    A.    Yes, they were.

18    Q.    Who sent them to that lab?

19    A.    The FBI.

09:28 20    Q.    And what was the purpose of sending those materials to the

21    lab?

22    A.    For an analysis, initially to determine what they might

23    be.  They were unknown, somewhat unknown, but the lab does an

24    analysis of all biological material from the Customs ports of

09:29 25    entry.

1  Q.   And, generally, it was to determine what exactly it was,

2  right?

3  A.   Yes, correct.

4  Q.   Was there somebody in particular at that center who

09:29  5  examined these materials?

6  A.   Yes.

7  Q.   Who?

8  A.   I spoke to doctor -- his name is Dr. Boal.

9  Q.   And you said you spoke to him.  When did you speak with

09:29  10  him?

11  A.   I would -- I think it's the seventh.  It was Wednesday,

12  May 7th.

13  Q.   And when you spoke to Dr. Boal, what, if anything, did he

14  tell you about his inspection of these materials?

09:29  15  A.   Well, he confirmed that they were biological material.  He

16  also confirmed that they were frog embryos without doing

17  further DNA analysis.  He confirmed they were Xenopus species,

18  some of which were he described mutated in an odd way, but did

19  confirm that they were biological in nature.

09:30  20  Q.   So fair to say that was his preliminary finding that he

21  reported to you after his inspection of the materials?

22  A.   Yes, correct.

23  Q.   Okay.  Special Agent, if Ms. Petrova had declared these

24  items at the airport that day as she was coming in, would CBP

09:30  25  have permitted her to leave the airport with them?

A.    No.

            MR. HOLCOMB:  Can I have a moment, your Honor?

            THE COURT:  Yes.

            MR. HOLCOMB:  Nothing more, your Honor.

09:31       THE COURT:  Mr. Fick?

CROSS-EXAMINATION BY MR. FICK:

Q.    Good morning, Special Agent.

A.    Good afternoon.

Q.    My name is William Fick.  I represent Ms. Petrova.

09:31       So you talked a little bit at the beginning about

your experience as an HSI investigator and you talked, I think,

about the process by which sometimes CBP makes referrals to

HSI.  Do you recall that?

A.    I do.

09:31 Q.    So when CBP encounters a potential smuggling import

violation at Logan Airport, what typically happens?

A.    It can depend on the material.  If it's drugs, it's an

automatic referral to the duty agent.  There's a procedure for,

in this case, material of biological in nature, that referral

09:31 goes to the FBI.  There also could be -- there's other ways

that we are referred cases from CBP.

Q.    Is it common that referrals happen contemporaneously with

discovery of the item?

A.    Not always.

09:32 Q.    Is that the most common the way it happens, by calling the

1    duty officer?

2    A.    I won't say most often anymore.  I think used to be but

3    not so much anymore.

4    Q.    You, yourself, were not present at Logan Airport on

09:32  5    February 16th, is that correct?

6    A.    That's correct.

7    Q.    And you have no firsthand knowledge of these events other

8    than -- no firsthand knowledge, right, correct?

9    A.    Correct.  I wasn't -- yeah, correct.  I wasn't present.

09:32 10    Q.    And your knowledge is derived from reading reports, right?

11    A.    Yes.

12    Q.    And talking to some of the CBP personnel involved, is that

13    right?

14    A.    There's other steps, but that is a --

09:32 15    Q.    What other steps did you use to sort of learn the facts

16    here?

17    A.    So there's reports, interviews.  Yeah.  That's pretty much

18    it, reports and interviews.

19    Q.    You mentioned talking to the Agricultural officer.  When

09:32 20    did that take place?

21    A.    I would think it's May 5th.

22    Q.    And did you talk to anyone else from CBP about this

23    incident?

24    A.    Yes.

09:33 25    Q.    Who?

|   |   |
|---|---|
| 1 | A.    Several.  I'd say a few people that were there. |
| 2 | Q.    Who were there? |
| 3 | A.    Yes. |
| 4 | Q.    And did you write-up reports of those interactions? |
| 09:33 5 | A.    The reports -- it was basically reading the reports with |
| 6 | the officer. |
| 7 | Q.    Okay.  So, in other words, you did not create your own |
| 8 | reports about your interactions with that CBP personnel? |
| 9 | A.    Correct. |
| 09:33 10 | Q.    So when you told us sort of your memory of some of those |
| 11 | interactions today, that's just based on your memory sitting |
| 12 | here today? |
| 13 | A.    From the reports. |
| 14 | Q.    Okay. |
| 09:33 15 | A.    Yes. |
| 16 | Q.    And I think you wrote a report in which you listed, I |
| 17 | think, six reports and eight photographs that you took |
| 18 | possession of and reviewed, right? |
| 19 | A.    I think that's probably correct. |
| 09:33 20 | Q.    Okay.  Does it ring a bell that the sixth report in the |
| 21 | list was something called "Petrova closeout"? |
| 22 | A.    It does sound familiar. |
| 23 | Q.    What was Petrova closeout? |
| 24 | A.    Off the top of my head, I'm not sure what the title, what |
| 09:34 25 | that references. |

1   Q.   Was there some indication that CBP had closed its own

2   inquiry into this matter at some point?

3   A.   Oh, if that -- I believe the closeout in that terms for

4   Customs is the final report, the finishing of the report.

09:34  5   Q.   Do you know roughly what date that report was made?

6   A.   I do not.

7   Q.   So you opened the HSI investigation on May 2, 2025, right?

8   A.   Correct.

9   Q.   You said that was as a result of a referral?

09:34 10   A.   Yes.

11   Q.   Where did the referral come from?

12   A.   The referral came from our Domestic Operations, the

13   headquarters.

14   Q.   What is Domestic Operations headquarters of HSI?

09:34 15   A.   It's like a unit that sends referrals to the field for --

16   well, they do a lot of things, but one of the items is they

17   refer investigative referrals to the field.

18   Q.   So your headquarters made the referral.  It didn't come

19   from CBP at Logan, in other words?

09:34 20   A.   No.

21   Q.   Okay.  Do you know who sort of initiated the referral at

22   HSI?

23   A.   I believe it was --

24         MR. HOLCOMB:  Your Honor, I object on grounds.

09:35 25         MR. FICK:  It's not going to linger.  It's just some

1    background.  I think the timing of this is curious and I think

2    it's an important piece.

3              THE COURT:  I'll let it go a little.  I'll let it go a

4    little.

09:35  5    A.   Often times in the standard practice for a lot of these

6    referrals are a review of the A files.  I'm not going to say I

7    don't know the answer to your question, but reviewing A Files

8    in the course of Immigration proceedings often triggers an

9    investigation.

09:35  10   Q.   Okay.  So someone at HSI, perhaps in conjunction with

11   immigration proceedings, referred this for a criminal

12   investigation?

13   A.   Correct.

14             MR. HOLCOMB:  Objection.

09:35  15            MR. FICK:  I'm done.  I think I answered the question.

16   I'll continue.

17             THE COURT:  Are you moving to strike the answer?

18             MR. HOLCOMB:  No, your Honor.

19             THE COURT:  Okay.

09:35  20   Q.   Do you have any idea why it took two and a half months

21   after the incident for the referral to happen?

22   A.   I won't say that it's very unusual to get referrals in

23   this manner.

24   Q.   Now, we talked a lot about biological products.  In your

09:36  25   understanding, for legal purposes of the Immigration and

1   Customs laws, what are biological products?

2   A.   I don't think there's a simple definition of that.

3   Q.   Well, I mean, you've been doing this for 18 years, right?

4   So what's your understanding of what is a biological product?

5   A.   I won't be able to define it for you, but I would -- what

6   I was told is these frog embryos are biological materials.

7   Q.   You were told that by whom?

8   A.   By the -- by Dr. Boal.

9   Q.   The doctor who looked at the materials after the fact?

10   A.   Yes, but the CBP officers also determined that it's

11   biological materials.

12   Q.   So you're an HSI agent with 18 years of experience.

13   You've done a lot of work with CBP.  I'm still trying to

14   understand what is your understanding of what constitutes a

15   biological product.

16   A.   I would -- embryos.  What's often encountered is plasmids

17   or living things, plants.  I don't know how to, but there are

18   agriculture specialists that make that determination.

19   Q.   How's a traveler supposed to know what's a biological

20   product regulated under Customs law if you can't answer the

21   question?

22   A.   Well, there's requirements that are posted on their

23   website, Customs website.

24   Q.   So you're saying that there's a description on the Customs

25   website of what a biological product is, but sitting here today

1    you can't answer what it is?

2    A.    The description is I believe also wide, clearly -- I mean,

3    they're biological material.  I saw the pictures of them.

4    Q.    Biological material.  I mean my shoe leather came from a

09:38  5    cow.  Is that a biological product?

6    A.    That would be a shoe.

7    Q.    At one time it was a cow, right?

8    A.    Embryos would be different.

9    Q.    Okay.  Are you aware that there is a, in the federal court

09:38  10    of regulations, there is a legal definition of biological

11    products?

12    A.    Relevant to these embryos or?  I don't know what it's

13    referring to.

14    Q.    Are you aware that in the Code of Federal Regulations

09:38  15    regarding agricultural regulation there is a definition of

16    biological products?

17            MR. HOLCOMB:  Your Honor, can he give him the cite?

18            MR. FICK:  I'm getting there.

19            THE COURT:  Let's start with what the witness knows.

09:38  20    A.    I mean, I've heard there's one that's pretty tailored to a

21    certain statute or a certain regulation that is not related to

22    this, but that's -- that's my understanding.

23    Q.    So I'm going to put on the screen 9 CFR 101.2, and I guess

24    we can call this Exhibit 6.  Are you aware of any other

09:39  25    definition in the Code of Federal Regulations or elsewhere

1    about what a biological product is?

2    A.    Not to my knowledge.

3    Q.    Okay.  So if I can read here --

4          THE COURT:  Before you go, I don't have any exhibits

09:39  5    except one through 5.

6          MR. FICK:  I'm sorry.  I will hand up a copy.  I

7    apologize.  I think Exhibit 6 is the next number and I would

8    move it -- you can take judicial -- it's judicial notice of

9    this law.

09:39 10          THE COURT:  So you want me to mark it as Exhibit 6 so

11   we have a record?

12          MR. FICK:  Yes.  I appreciate that.

13          THE COURT:  Okay.

14          (Exhibit 6 admitted into evidence.)

09:39 15   Q.    So from reading the beginning of the definition here the

16   term "biologic products", also referred to in the subchapters,

17   "shall mean all viruses, serums, toxins (excluding substances

18   that are selectively toxic to microorganisms, e.g.,

19   antibiotics), or analogous products at any stage of production,

20   shipment, distribution, or sale, which are intended for use in

21   the treatment of animals and which act primarily through the

22   direct stimulation, supplementation, enhancement, or modulation

23   of the immune system or immune response".

24          Do you see that?

09:40 25   A.    I do.

```
      1   Q.   And then it continues to sort of further describe that

      2   first sentence definition?

      3   A.   Correct.

      4   Q.   Do the frog embryos seized here meet that definition?

09:40 5        MR. HOLCOMB:  Your Honor, I object.  It hasn't been

      6   established this is the requirements we're talking about.  He's

      7   asking the witness about a definition section of one statutory

      8   chapter --

      9        THE COURT:  So a legal -- as a legal argument, are you

09:40 10  arguing that this section is not applicable?

     11        MR. HOLCOMB:  I'm saying we don't -- we haven't

     12   established that it is applicable.  He's asking the witness

     13   about it.  We don't know which section this is from.

     14        THE COURT:  What are you proceeding under?  Is this

09:41 15  the definition that you're relying on?

     16        MR. HOLCOMB:  No.  We're relying on the general

     17   requirement to declare anything being brought in, biological or

     18   not.

     19        THE COURT:  You can ask him if he relied on this in

09:41 20  connection with his work.

     21   Q.   Are you aware of any other legal definition in any sort of

     22   body of American statutory or regulatory law that defines

     23   biological products other than this?

     24        MR. HOLCOMB:  Your Honor, he's not a lawyer.

09:41 25       THE COURT:  He can answer.
```

         1    A.   The only thing I've seen was something similar to this

         2    that was in the CFR that was related to something back up to

         3    the prior subsection that had nothing to do with what we are

         4    talking about.

09:41    5    Q.   Okay.  Sir, I understand that you're not a lawyer, but

         6    you've alleged there's probable cause to believe my client

         7    smuggled biological products into the United States.  I'm

         8    trying to understand legally what you believe to be a

         9    biological product.

09:42   10    A.   The frog embryos.

        11    Q.   And on what basis do you say frog embryos qualifies as a

        12    biological product under the law as the law is written?

        13    A.   I was informed that they're biological materials by CB

        14    experts -- sorry -- agriculture experts in the laboratory.

09:42   15    Q.   Do you have any idea under what provision of law that

        16    information conveyed to you is based?

        17    A.   My -- I'm not sure that it is defined in a law.

        18    Q.   Now, do you know whether there are signs at Logan Airport

        19    telling people what biological products are?

09:42   20    A.   Do I know if there are any?

        21    Q.   Yes.

        22    A.   I don't know.

        23    Q.   Do you know if Ms. Petrova was given or supplied a

        24    definition of biological products by the CBP people she

09:43   25    interacted with?

         1    A.    I don't know.

         2    Q.    Certainly you have no information to suggest she was given

         3    any such information, right?

         4    A.    Well, she was asked about it.

09:43    5    Q.    Well, there's sort of an assertion that you have

         6    biological products without a definition, is that right?

         7    A.    Well, she also referred to them as biological products, so

         8    I don't -- I think it's a general term, biological products.

         9    Q.    Now, you do agree that the frog embryos she was carrying

09:43   10    were not alive, correct?

        11    A.    I don't know.

        12    Q.    You don't know?

        13    A.    I saw pictures.  I don't -- I assume they're not, but I'm

        14    not --

09:43   15    Q.    We're 4 months after the fact and you talked to the doctor

        16    who investigated, looked at them at this laboratory.  Do we not

        17    all agree that these were not living embryos?

        18            MR. HOLCOMB:  Your Honor, relevance.  It doesn't

        19    matter whether they're alive or dead.

09:44   20            THE COURT:  Overruled.  I don't know what definition

        21    you're working off of.  I'm happy to have you describe it and

        22    we can argue about it later.

        23    A.    I don't know.  They were in a cooler.  I don't know alive

        24    or dead.

09:44   25    Q.    Okay.  Does -- are you familiar with the term "formal and

1    fixed"?

2    A.    I know the words but not specifically referenced to these

3    items.

4    Q.    Well, are you aware that there was expert testimony in a

09:44  5    related proceeding in Vermont about what these things are?

6           MR. HOLCOMB:    Objection.

7           THE COURT:    Sustained.

8    Q.    So isn't it true that what Ms. Petrova possessed were

9    formal and fixed frog embryos, meaning essentially contained in

09:44 10    a formaldehyde solution?

11           MR. HOLCOMB:    Objection.    It's not his testimony of

12    what those mean.

13           THE COURT:    Overruled.

14    A.    They're in -- I see tubes with embryos in them.    I don't

09:45 15    know how to formally describe them.

16    Q.    But --

17           THE COURT:    Wait, wait, wait, wait.    Hold on.

18           When you did your affidavit and you referred to

19    biological materials, where did you get that phrase from?

09:45 20           THE WITNESS:    From the interviews with Customs

21    officers and the doctor at the Fort Detrick laboratory.

22           THE COURT:    And they identified these frog embryos as

23    biological?

24           THE WITNESS:    Yes, correct.

09:45 25    Q.    And when they made those statements to you about these

1   being biological, do you know if they were speaking

2   colloquially or they were speaking as a matter of legal

3   definition?

4   A.   I don't -- it didn't matter for my purposes.

09:45 5   Q.   The legal definition didn't matter for the purposes of

6   charging Ms. Petrova with a crime?

7   A.   It was -- it was irrelevant to the smuggling charge.

8   Q.   Well, you're -- you've charged her with smuggling

9   biological products.  If it's not a biological product, isn't

09:45 10   it true she's not guilty of that crime?

11         MR. HOLCOMB:  Objection, your Honor.

12         THE COURT:  Overruled.

13   A.   Sorry.  Could you just repeat that, please.

14   Q.   Well, you've said there is probable cause to believe

09:46 15   Ms. Petrova committed the crime of smuggling biological

16   products, right?

17   A.   Correct.

18   Q.   If the materials she possessed does not qualify under the

19   law as a biological product, that would mean she is not guilty

09:46 20   of the crime, correct?

21         THE COURT:  That's beyond his expertise.  That's for

22   the Court to decide.

23         MR. FICK:  All right.  I'll move on.

24   Q.   Do you have any reason to think that these materials

09:46 25   Ms. Petrova had had any commercial value?

          1    A.    I'm sure they have some value I'm not aware of what that

          2    value would be.

          3    Q.    You have no information about whether they have any

          4    commercial value?

09:46     5    A.    I don't know.

          6    Q.    Okay.  I want to talk a little bit about the smuggling

          7    statute itself that you said there was probable cause to

          8    believe occurred here.  I'm going to put that up on the screen

          9    as well.  We'll mark this as Exhibit 7 for identification.

09:47    10    I'll give the Court a copy.

         11            (Exhibits 7 admitted into evidence.)

         12    Q.    I believe in your affidavit the section you quoted is

         13    under the first paragraph here.  "Whoever knowingly and

         14    willfully, with intent to defraud the United States, smuggles

09:47    15    or clandestinely introduces, or attempts to smuggle or

         16    clandestinely introduces into the United States any merchandise

         17    which should have been invoiced or makes out or passes or

         18    attempts to pass through the customhouse any false, forged, or

         19    fraudulent invoice has committed the crime".

09:47    20            Do you see that?

         21    A.    I do.

         22    Q.    So what's your understanding of what constitutes

         23    merchandise under the statute?

         24            MR. HOLCOMB:  Objection.

09:47    25            THE COURT:  Sustained.

```
 1   Q.    Well --

 2             MR. FICK:  Your Honor.

 3             THE COURT:  You can ask him why he thinks.

 4             MR. FICK:  Sure.

 5   Q.    Here's a question then.  First of all, the word

 6   "merchandise" in the English language connotes products bought

 7   and sold by a merchant, is that right?  Fair to say?  It's a

 8   plain language issue?

 9   A.    I think it could be anything.

10   Q.    You think it could be anything?

11             THE COURT:  That's sustained.

12             You can raise your legal arguments later, we can have

13   that, but this is trying to elicit what this witness has as

14   facts.

15             MR. FICK:  Okay.

16   Q.    Now, you also testified at the beginning or earlier you

17   testified something to the effect that any item acquired abroad

18   and brought into the United States needs to be declared, right?

19   A.    It depends on visitors or non-visitors but, in general,

20   things that have never been in the United States before need to

21   be declared.

22   Q.    Okay.  And is there any limitation on the scope of that in

23   your understanding?

24   A.    There are some personal exceptions if, for example, you're

25   traveling to the U.S. as a visitor and you don't have anything
```

1    that's staying in the United States.  You have clothes and

2    toiletries or whatever, you don't have to declare your personal

3    property if it's going back with you when you leave, things

4    like that.

09:49  5    Q.   So but like if I, for example, as an American buy like an

6    Eiffel Tower magnet at Charles de Gaulle airport and bring it

7    back, have I committed the crime of felony smuggling if I don't

8    declare that?

9          MR. HOLCOMB:  Objection.

09:49  10         THE COURT:  Overruled.

11   A.   There's personal exceptions for --

12   Q.   Based on -- I'm sorry.  Go ahead.

13   A.   -- based on a dollar value, but you are required to

14   declare all items that you acquired abroad.

09:49  15   Q.   But there is an exception based on value?

16   A.   As far as -- as far as written declaration goes.  You're

17   allowed an oral declaration if it's under $800.

18   Q.   So if I don't make an oral declaration, I've committed a

19   crime if I brought an Eiffel Tower magnet?

09:50  20         MR. HOLCOMB:  Objection.

21         THE COURT:  Sustained.

22   Q.   Now, you talked a little bit about the primary inspection

23   Ms. Petrova went through and you said you watched the video of

24   that interaction, right?

09:50  25   A.   Yes.

1    Q.   Okay.  And -- well, actually, before I get to that, as a

2    general matter, it's fair to say in years past it was common

3    practice to get a Customs declaration on the airplane before

4    you got to the destination in the United States, correct?

09:50  5    A.   Correct.

6    Q.   And that no longer happens, correct?

7    A.   Correct.

8    Q.   So it's now sort of up to the traveler to understand what,

9    if anything, they should declare if they don't get a piece of

09:50  10    paper in hand, right?

11    A.   Yes.  There's some signage but yes.

12    Q.   And when a traveler arrives for primary inspection,

13    sometimes the officer will ask, do you have anything to

14    declare, something like that, right?

09:50  15    A.   Yes.

16    Q.   Not always, right?

17    A.   Correct.

18    Q.   And what happened here -- first of all, that general

19    question was not asked of Ms. Petrova at primary inspection,

09:51  20    right?  There was no question, general question, do you have

21    anything to declare, right?

22    A.   Correct.

23    Q.   She was asked the question where are you coming from,

24    right?

09:51  25    A.   Yes.

1    Q.    And she responded France?

2    A.    Correct.

3    Q.    And then the follow-up to that was any other countries or

4    just France, right?

09:51  5    A.    Correct.

6    Q.    So that's not even a complete sentence, is it?

7    A.    That's what was said.

8    Q.    I mean, the first question is where are you coming from,

9    right?

09:51 10    A.    Yes.

11    Q.    And then the next question is, any other countries, right?

12    A.    Correct.  I believe so.

13    Q.    Okay.  And so a direct flight from France, there's no

14    connection, you're coming from France, fair to say?

09:51 15    A.    Correct.

16    Q.    The officer did not ask her, give me a list of all the

17    countries you've visited since the last time you left the

18    United States, right?

19    A.    Correct.

09:51 20    Q.    And later when she was asked that question she gave a list

21    of all the countries she had visited since she last left the

22    United States, right?

23    A.    Yes, the Secondary, correct.

24    Q.    Okay.  So it's not that she was lying in the Primary when

09:52 25    asked the question about France, right?

         1   A.    I'm sorry.  Can you repeat that?

         2   Q.    You're not suggesting she was lying in Primary when she

         3   answered the question about France, correct?

         4         MR. HOLCOMB:  I object.

09:52    5         THE COURT:  I think this witness has indicated on

         6   certain occasions the impression was that it was an accurate

         7   statement.

         8         So I guess the question to you would be:  Do you think

         9   that's an inaccurate answer based on the information that you

09:52   10   have?

        11         THE WITNESS:  Yes.

        12   Q.    So your belief was that it was an inaccurate answer to the

        13   incomplete question "any other countries"?

        14   A.    Yes.

09:52   15   Q.    Okay.  Now, she was then asked if she had any food items,

        16   right?

        17   A.    Yes.

        18   Q.    And in your report about watching the video, I think you

        19   noted that the answer was inaudible, is that right?

09:53   20   A.    Correct.

        21   Q.    But your testimony was that she said no.  What's that

        22   based on?

        23   A.    So the officer repeated her -- the video is clear that the

        24   officer repeated her answer.

09:53   25   Q.    So but you didn't note that in your report about your

1    review of the incident?

2    A.    I just indicated the quotes.

3    Q.    And, to be clear, she was not asked at primary inspection

4    if she had any biological materials, correct?

09:53  5    A.    Correct.

6    Q.    Now, she -- the dog alerts.  She goes to Secondary

7    Inspection you testified, right?

8    A.    Yes.

9    Q.    The interaction at Secondary Inspection, is that audio or

09:53 10    video recorded to your knowledge?

11    A.    I believe so, but depends on the location.

12    Q.    Do you know whether there's an audio or video recording in

13    this case?

14    A.    Likely.

09:53 15    Q.    Likely but you're not sure?

16    A.    Not sure.

17    Q.    Okay.  I'm going to put up on the screen briefly

18    Exhibit 3, which is this sort of transcript like document.  Do

19    you remember that?

09:54 20    A.    Yes.

21    Q.    First of all, this is like, I think it -- fair to say this

22    is a computer printout of a saved version, not a copy of the

23    original, is that right?

24    A.    Yes, that's correct.  I did notice that.

09:54 25    Q.    Because the date May 7th here, that's not the date she was

|   |   |
|---|---|
| 1 | at the airport, right? |
| 2 | A.    Correct.  The original would be in the alien file. |
| 3 | Q.    And there's some like missing fields that are probably |
| 4 | filled in the original? |
| 09:54 5 | A.    Hundred percent, correct. |
| 6 | Q.    Okay.  And -- all right.  And then we talked a little bit |
| 7 | about -- and, by the way, this is supposed to be a kind of |
| 8 | verbatim rendition of the conversation between the CBP officer |
| 9 | and the person, right? |
| 09:54 10 | A.    Essentially. |
| 11 | Q.    Do you know if it's made contemporaneously, they're typing |
| 12 | as the speaking happens or it gets written up afterwards? |
| 13 | A.    I believe it's contemporaneous. |
| 14 | Q.    And I think we established, right, that this question on |
| 09:55 15 | page 3 -- question:  "You were asked by the primary officer if |
| 16 | you were traveling with any biological material.  You stated |
| 17 | no.  Do you understand?" |
| 18 | Answer:  "Yes." |
| 19 | That is inaccurate, right? |
| 09:55 20 | A.    Correct. |
| 21 | Q.    So, essentially, the officer interviewing her at Secondary |
| 22 | falsely told her that she had answered the question wrong at |
| 23 | Primary and got her to agree do it? |
| 24 | MR. HOLCOMB:  Objection. |
| 09:55 25 | THE COURT:  Sustained.  I lost that one. |

1   Q.  Well, the question is posed by the CBP officer at

2   Secondary, right?

3   A.  Correct.

4   Q.  If you're reading the question, the CBP officer at

09:55  5   Secondary tells her that she was asked at Primary if she had

6   biological materials and she denied it, right?

7         MR. HOLCOMB:  Objection.

8         THE COURT:  Overruled.

9         MR. HOLCOMB:  Characterization.  The officer didn't

09:56 10  tell her.  He asked her.

11  Q.  All right.  He made a declaratory statement in a question

12  suggesting to Ms. Petrova that she had falsely told the officer

13  at Primary that she didn't have biological materials, correct?

14  A.  Just one more time on that question.  I just want to make

09:56 15  sure I get it right.

16  Q.  At the bottom of page 3, we're at this question we talked

17  about in your direct testimony.

18  A.  Sure.

19  Q.  If this is an accurate transcript, the question posed by

09:56 20  the secondary officer was:  "You were asked by the Primary

21  officer if you were traveling with any biological material.

22  You stated no.  Do you understand?"

23         Answer:  "Yes."

24         So if I'm understanding this correctly, in his

09:56 25  question or her question, the officer at Secondary inaccurately

1    tells Ms. Petrova that she falsely answered a question at

2    Primary when, in fact, that did not occur?

3              MR. HOLCOMB:  Objection.

4              THE COURT:  Do I have the record right that she was

09:57  5    not asked at Primary whether she was traveling with biological

6    materials?

7              THE WITNESS:  That is correct.

8    Q.    So the assumption embedded in this question asked at

9    Secondary that the officer got Ms. Petrova to agree to is

09:57 10    wrong, correct?

11              MR. HOLCOMB:  Objection.

12              THE COURT:  Sustained.

13    Q.    And, again, to the best of your knowledge, there was no

14    definition of biologic materials provided to Ms. Petrova at

09:57 15    Secondary, correct?

16    A.    Not that I know of, correct.

17    Q.    There was sort of statements that these are biologic

18    materials to which Ms. Petrova then agreed, correct?

19              MR. HOLCOMB:  Objection to the characterization.

09:57 20              MR. FICK:  Your Honor, this is --

21              THE COURT:  No.  That's overruled.

22    A.    Again, I think they were discussing these items in the

23    broad sense of biological materials, like just what they are in

24    general.

09:58 25    Q.    But, again, does the law prohibit the import of biological

1    materials in a broad sense or is there a legal definition?

2            MR. HOLCOMB:  Objection.

3            THE COURT:  Sustained.

4    Q.   I'm going to go back to your affidavit now, discussion of

09:58 5    the text messages.  There's this discussion -- or, actually,

6    we'll use the version that's in Exhibit 3 instead.  Okay.

7            So at the bottom of page 4, the discussion -- you

8    remember testifying about the discussion of CBP manually going

9    through her phone and showing her this text message from Will

10:20 10   Trim, correct?

11   A.   I don't know if they showed it to her.  I know they

12   reviewed it.

13   Q.   They asked her about it?

14   A.   Yes, correct.

10:20 15   Q.   And the text message said, "if you bring samples or

16   antibody back, make sure you get the permission, et cetera,

17   like the link I sent to Leon group chat about frog embryos

18   because TSA went through my bag at Customs".

19           You see that?

10:20 20   A.   I do.

21   Q.   Do you know whether TSA -- or not TSA.  Do you know if CBP

22   went through the phone to find the link that was posted in the

23   group chat?

24   A.   I don't know.

10:21 25   Q.   Do you know whether the conclusion the lab drew from the

```
  1   link in that group chat was, in fact, frog embryos could be

  2   transported freely?

  3            MR. HOLCOMB:  Objection.

  4            THE COURT:  Overruled.

10:21  5   A.   I'll have to hear it one more time, please.

  6   Q.   Do you know whether the link that is referred to there,

  7   that when the lab reviewed that link they determined frog

  8   embryos could be transported freely?

  9   A.   That link was not in Customs possession.

10:21 10   Q.   Since that happened, have you had occasion to go back and

 11   review any of Will Trim's emails or messages to find that link?

 12   A.   I have not.

 13   Q.   Okay.  In any event, Ms. Petrova was not accused of

 14   bringing back antibodies, right?

10:21 15   A.   Correct.

 16   Q.   Just frog embryos?

 17   A.   Yes.

 18   Q.   Okay.  Do you know if CBP asked Ms. Petrova to identify

 19   the link in the phone and show them what it showed?

10:22 20   A.   Not to my knowledge.

 21   Q.   Now, talking about the messages from Leon Peshkin -- hold

 22   on here.  Next page.

 23            The exchange with Peshkin, I think we saw, was

 24   originally in Russian, correct?

10:22 25   A.   Yeah.  I believe it to be Russian.
```

1    Q.    Okay.  Do you know whether the CBP officers at the airport

2    could read Russian or they were using a translate app as well?

3    A.    I think they were using a translate app as well.

4    Q.    Okay.  And you see these -- the series of sort of the

10:22  5    symbols and numbers and "no plan yet" and then a string of

6    symbols and numbers.  Do you have an understanding that that's

7    like what happens when you try to cut and paste on emoji?

8    A.    Yes, that's correct.

9    Q.    So those things are probably emojis?

10:22 10    A.    Correct.

11    Q.    And so Peshkin asked, "Do you have a plan to get through

12    Customs", right?

13    A.    Yes.

14    Q.    And, in fact, you've done some other investigations of

10:23 15    statements Peshkin has made that suggested he had concerns

16    about losing samples when they get shipped and things like that

17    so he wanted people to carry them on their persons, right?

18    A.    Have I?

19    Q.    You conducted an investigation of other statements Peshkin

10:23 20    has made, right?

21    A.    Correct.

22    Q.    And you've aware that Peshkin has made various statements

23    about or having concerns about samples getting lost in transit

24    and wanting people to carry them back on their person, right?

10:23 25    A.    I don't recall that but not that it was Peshkin.  I'm not

certain of that.

Q.   Okay.  In any event, Peshkin asks, "Do you have a plan to get through Customs", right?

A.   Correct.

10:23  Q.   And her answer is "No plan yet, emoji.  I won't be able to swallow them, emoji".  Do you see that?

A.   Yes.

Q.   Plainly, that's a joke, right?

      MR. HOLCOMB:  Objection.

10:23       THE COURT:  Sustained.

Q.   Well, I mean, we've seen the pictures, right?  You could not actually swallow all those samples; fair to say?

A.   That is fair to say.

Q.   And would it surprise you to learn that that emoji in the

10:23 original was a double smiley face?

      MR. HOLCOMB:  Objection.

      THE COURT:  Sustained.

      MR. FICK:  One moment, your Honor.

      Just a couple more questions, your Honor.  And I don't

10:24 want to run afoul of the objections sustained.  I'm not asking the witness a legal opinion, but I just --

Q.   Given that you swore out this affidavit for probable cause, what is your basis on the facts of which you're aware to allege that Ms. Petrova's samples constituted merchandise

10:24 within the meaning of the statute?

A.    It is the goods that were brought into the United States

and intended to remain here, and they were not declared.

Q.    So anything brought into the United States, in your view,

could constitute merchandise?

10:25    MR. HOLCOMB:  Objection.

THE COURT:  Sustained.

MR. FICK:  All right.

Q.    You said, I think, at the end of your testimony that if

Ms. Petrova had declared the samples, CBP would not have

10:25  allowed them to leave the airport.  What's the basis for saying

that?

A.    That's -- Customs answered that question.  I asked the

question, what if they were declared or had permits or letters

or something that says they're not dangerous or hazardous.  And

10:25  they said that was not -- they would have detained them for a

lab analysis based on what they were.

Q.    And did you ask them what their legal basis for saying

that was?

MR. HOLCOMB:  Objection.

10:25    THE COURT:  He can answer that question.

A.    The Agriculture Specialist, they look at even plants,

things that can come into the United States, they still look at

them for things that may be there that even the passenger may

not know about.  So they would -- the inspection would have

10:26  been a lot -- would not have been able to be completed on site,

1    the Customs inspection.

2    Q.   Do you know whether the Customs CBP people you were

3    talking to were at that point aware of the sort of exactly what

4    the specimens were?

10:26  5    A.   So they have -- the person that was not the canine handler

6    but the officer was a specialist in biological material -- it's

7    BTOS.  It's in the report.  I wish I knew what it stood for

8    right now, but biological threat officer.  They're people

9    trained in the Agriculture Secondary area that they're the

10:26 10    subject matter experts on things like this.

11    Q.   Okay.  But you didn't sort of follow-up with them to ask

12    about the state of their knowledge about exactly what these

13    things were, whether they were alive or formal and fixed or

14    anything like that?

10:27 15    A.   No.

16         MR. FICK:  Nothing further, your Honor.  Thank you.

17         THE COURT:  Any redirect?

18         MR. HOLCOMB:  Yes.

19    REDIRECT EXAMINATION BY MR. HOLCOMB:

10:27 20    Q.   Special Agent, you were asked a lot about the defined term

21    "biological product", correct?

22    A.   Yes.

23    Q.   And I believe you answered that you believe that the

24    reference is to biological material were more in the general or

10:27 25    spoken of in the general sense?

         1    A.    Absolutely.

         2    Q.    Could I direct your attention again to Exhibit 3.  This is

         3    the sworn statement.  Page 3.  Just to point these out again,

         4    at the bottom here there's a question that she was asked, if

10:28    5    she was traveling with any biological material.  Do you see

         6    that?

         7    A.    Yes.

         8    Q.    And then isn't it correct that the next three or four,

         9    five questions, six questions all ask about biological

10:28   10    material, correct?

        11    A.    Yes.

        12    Q.    Did Ms. Petrova at any point object that these were not

        13    biological material?

        14    A.    No.

10:28   15    Q.    Special Agent, are individuals required to answer

        16    questions posed to them by CBP officials truthfully?

        17    A.    Yes.

        18    Q.    And does that requirement at all depend as to whether the

        19    question is about biological material?

10:29   20    A.    No.  It would be all relevant material questions.

        21    Q.    Does that depend at all on whether something has

        22    commercial value?

        23    A.    It does not change.

        24    Q.    So whatever the thing is, the person's required to answer

10:29   25    questions about it truthfully, is that correct?

1    A.    Correct.

2    Q.    And then going back to the requirement to declare items

3    generally.  Does it matter whether something is biological or

4    not when it comes to the requirement that a person declare

10:29  5    something they're bringing into the country?

6    A.    No.

7    Q.    Does it matter whether something has commercial value if

8    they're required as a general matter whether they're required

9    to declare --

10:29 10        MR. FICK:  Your Honor, I'm going to object given this

11    is legal opinion.

12        THE COURT:  I'm going to sustain your objection.

13        I would like an understanding though of if people are

14    no longer getting those Customs cards, what information do they

10:30 15    have about what needs to be declared.

16        THE WITNESS:  So the source would be -- I mean,

17    there's resources.  Some people obviously have advanced

18    knowledge, your Honor, but there are resources of what can and

19    cannot come into the country on the Customs web page.  There is

10:30 20    some signage, but the requirements are on the traveler prior to

21    arriving in the U.S. of what can and cannot come into the

22    country, what's prohibited and what isn't.

23        THE COURT:  To your knowledge, do any of those places

24    identify with any particularity embryos, animal embryos?

10:31 25        THE WITNESS:  Within the CBT website -- oh,

1    specifically embryos?  Not to my knowledge.

2    Q.    Special Agent, to your knowledge do the requirements set

3    out the rules for every conceivable object that might be

4    brought into the country?

10:31  5    A.    No, just categories essentially.

6    Q.    And who's ultimately supposed to make a determination as

7    to whether something can permissibly be brought through

8    Customs?

9    A.    Specifically, agriculturally related products like this,

10:31 10    that would be the inspectors.

11    Q.    And that's inspectors with Customs and Border Protection,

12    correct?

13    A.    Correct.

14    Q.    So when somebody is required to declare something and they

10:31 15    don't declare it, CBP doesn't have a chance to make that

16    determination, do they?

17             MR. FICK:  Objection.

18             THE COURT:  We're in a circle.  That's sustained.

19    Don't answer that.

10:32 20             MR. HOLCOMB:  I have nothing further, your Honor.

21             THE COURT:  Anything further?

22             MR. FICK:  No, your Honor.

23             THE COURT:  You may step down.

24             THE WITNESS:  Thank you.

10:32 25             THE COURT:  Does the government have any further

1    evidence?

2            MR. HOLCOMB:  No.

3            THE COURT:  Does the defense have any evidence?

4            MR. FICK:  No, your Honor.

10:32  5            THE COURT:  Are you prepared to argue?

6            MR. HOLCOMB:  Yes.

7            THE COURT:  Okay.  Go ahead.

8            MR. HOLCOMB:  As your Honor knows, this is a probable

9    cause hearing.  The probable cause standard is just a fair

10:32 10   probability or a reasonable likelihood here.  And here the

11   complaint and the supporting evidence easily established that.

12           It's a criminal offense to fraudulently and knowingly

13   import and bring into the United States merchandise contrary to

14   law.  At minimum, Ms. Petrova was required to declare anything

10:33 15   she was bringing back into the country.  She was also required

16   to provide truthful answers to the CBP agents who were doing

17   their jobs.

18           Her conduct at the airport and her messages with

19   colleagues show that she set out to sneak these embryos into

10:33 20   the United States without declaring them and without CBP

21   becoming aware of them.  As the messages showed just a few days

22   before travel, Mr. Trim, her colleague, told her, "If you bring

23   samples or antibody back, make sure you get permission, et

24   cetera".

10:33 25           The day of her travels she was exchanging messages

1   with her principal investigator, Mr. Peshkin.  She reported

2   that she was on her way to the gate and had the samples on ice

3   and she reported that she had successfully got to the gate and

4   was essentially keeping him updated, all the while reporting

10:33 5   that she had the samples on ice and the samples weren't

6   noticed.

7       Mr. Peshkin asked her what her plan is.  He asked her

8   twice in the messages, and the sworn statement now show.  And

9   Ms. Petrova, instead of asking anybody, instead of declaring

10:34 10   the items, chose not to declare them.

11       She went through Primary.  She was asked if she

12   traveled anywhere other than France.  Anybody who speaks the

13   English language understands that a follow-up question "just

14   France" to the question of "where are you traveling from"

10:34 15   should be understood as are you traveling from any other

16   countries.  She said, "Just France".  She didn't report on the

17   other countries she had traveled to.  She also said she was not

18   carrying food items.

19       That's two simple lies she made to the Primary officer

10:34 20   at the point at which her first contact with CBP, at the point

21   at which she was supposed to declare anything she was bringing

22   back into the country.

23       Then when CBP called her to the Agricultural Secondary

24   area, she initially didn't respond.  As Special Agent

10:35 25   testified, CBP described her as having not responded to her

1    name being called on the intercom and staying by the baggage

2    carousel until CBP actually went and located her themselves by

3    photograph.

4         Then, finally, when she was first asked by the

10:35  5    Agricultural Specialist whether she was carrying any biological

6    material, she denied it.  And it was only when she was asked

7    again that she admitted to the material that she was carrying

8    in the plastic bag.  At that point, the CBP officers had

9    already found the other samples in her checked bag.

10:35 10         So taken together, these are actions of somebody who

11    is trying to bring something into the U.S. without declaring it

12    and without getting caught with it.  The CBP -- or I'm sorry.

13    The Special Agent testified that CBP would not have allowed her

14    to leave the airport that day with the samples and so --

10:36 15         THE COURT:  Say that again.

16         MR. HOLCOMB:  The Special Agent testified that CBP

17    would not have permitted her to leave the airport that day with

18    the samples.

19         THE COURT:  I actually -- with the samples.  I didn't

10:36 20    hear that they won't let her leave.  They just would have made

21    her keep the samples there.

22         MR. HOLCOMB:  Apologies for being unclear, your Honor.

23    Yes.  If she had declared them, she still would not have been

24    permitted to leave with the samples.  So that's further

10:36 25    evidence that she had a reason to try to get these into the

1    U.S. without declaring them.

2          Your Honor, the bigger point here -- so there was

3    obviously dispute as to defined terms, biological product.  She

4    wasn't asked about the specific statutory definition of

10:36  5    biological products.  She was asked if she was carrying

6    biological materials.

7          I think it's post hoc rationalization at best to deny

8    that these are biological materials when she herself answered

9    questions with the understanding that they were.  They were

10:37  10    embryos.  She's a researcher in a biology lab.  She

11    acknowledged that she was bringing these embryos back for the

12    purpose of biology experiments.

13          And then, to top it off, when the samples were sent to

14    the National Center where these types of materials are

10:37  15    analyzed, you heard from the Special Agent that he received

16    preliminary analysis that, yes, these embryos are, in fact,

17    clawed frog embryos.  They are biological.

18          But the bigger point here is it's CBP's job to make

19    that determination.  It's not Ms. Petrova's job or her

10:37  20    colleague's job to decide as to whether something technically

21    meets the statutory definition or if there is one, which in

22    this case there is not.  It's not their call as to whether

23    something is dangerous or whether something doesn't necessarily

24    need to be declared because it's dead, not alive.  It's CBP's

10:38  25    job to assess what's being brought in, and they can only do

1    that if items are declared.  That's why travelers are required

2    to declare the things they're bringing in.

3         She did not declare as required by law.  She also gave

4    a false statement -- a false answer to CBP officials when

10:38  5    questioned about it.  So, here, the evidence presented today,

6    your Honor, amply cleared the probable cause bar for the charge

7    in the complaint, which is the smuggling of these clawed frog

8    embryos fraudulently and knowingly into the United States.

9         THE COURT:  Thank you.

10:38 10        MR. FICK:  So, your Honor, I understand probable cause

11    is a very, very low bar.  I can probably count on one hand the

12    number of times the Court, a judge of this Court, has found no

13    probable cause, but it's important to remember here this is not

14    about what maybe someone should have done as a matter of best

10:39 15    practice.  It's not about whether there was a regulatory

16    violation here.  It's about whether there is probable cause to

17    believe a specific alleged crime was committed.  The crime that

18    is alleged here is smuggling of merchandise that has not been

19    invoiced, specifically biological materials, biological

10:39 20    products.

21         It's the government's burden of proof.  The

22    investigator, who swore out the affidavit, can't tell us what

23    qualifies as a biological product under the law as opposed to,

24    you know, a common sense or some kind of general understanding

10:39 25    that could, you know, encompass the leather in my shoe.

            The agent swearing out the affidavit saying there's

probable cause to believe there was a crime committed cannot

define what merchandise or invoicing under that statute means.

The crime alleged here is smuggling biological materials.  The

smuggling statute only covers merchandise that hasn't been

invoiced.  It's not any object in the world that hasn't been

declared.  Those are different words.  They have meaning to

real people.

            And whether or not there's a regulatory violation,

whether or not there was some mutual misunderstanding here,

like mistake, misunderstanding, miscommunication, that does not

make a crime or even probable cause to believe there was a

crime.

            You know, Ms. Petrova, I think in that sort of

transcript exhibit whatever, whether it's a transcript or not,

with the secondary inspector, I think she used the word

"biology" or "biological" once.  It's the inspectors who keep

saying biological to her over and over again and making her

agree, but it's not clear what definition anyone is operating

under.  That's not an admission.  It's an admission of a

colloquial understanding, if anything.  It's not the legal

admission of a violation of a legal duty or commission of a

crime.

            So, again, understanding probable cause is a very,

very low bar, I think the government really just -- I'm not

1    sure they understand their own charging theory here.  I think

2    on that basis there is not enough to say there is probable

3    cause to sustain this case.

4        THE COURT:  So is it your theory that to violate the

10:41  5    smuggling statute in this case the materials that needed to

6    have come into -- had to meet the definition of the

7    administrative definition of goods?

8        MR. FICK:  So there's two things at play here, right?

9    There's the smuggling statute that uses the words "merchandise"

10:42 10    and "invoice".  I think those have meaning that might there

11    would be a real void for Vegas problem if you expand those

12    beyond some -- some type of commonsense meaning.

13        And then here, the specific charge here is smuggling

14    of biological materials, which, again, my understanding, as a

10:42 15    matter of federal law, that's a specific thing.  The only

16    definition I've ever been able to find is the CFR that I've

17    handed out.  The fixed and formal and no longer living frog

18    embryos do not meet any of those pieces of that definition.

19        So, again, maybe not good practice.  Maybe there's no

10:42 20    regulatory violation here but certainly not the crime,

21    certainly not the specific crime alleged.

22        THE COURT:  Anything further?

23        MR. HOLCOMB:  No, your Honor, other than just to point

24    out that the requirement to declare items upon entering the

10:43 25    U.S. does not in any way hinge on whether something is a

1    biological material.

2          THE COURT:  Say that again.

3          MR. HOLCOMB:  The requirement to declare items when

4    entering the United States doesn't in any way hinge on whether

10:43 5    something is a biological material.

6          THE COURT:  I understand that, but you're not --

7    you're charging her with smuggling and I'm not sure of the

8    linkage.  You have to smuggle something that is not able to

9    come in.

10:43 10          MR. HOLCOMB:  That's correct, your Honor.  And the

11    complaint describes the smuggled items as biological materials.

12    That does not mean that they need to be biological materials to

13    satisfy what the smuggling statute criminalizes.

14          THE COURT:  So they have to have smuggled merchandise.

10:43 15          MR. HOLCOMB:  Contrary to law fraudulently and

16    knowingly, yes.

17          THE COURT:  So I have to find that the materials that

18    she brought in constitutes merchandise under the smuggling

19    statute.  I just want to know what I have to find or not.

10:44 20          MS. PELLEGRINI:  Your Honor, I'm sorry.  I don't mean

21    to interrupt counsel.

22          THE COURT:  You've been whispering all day.  Go ahead.

23          MS. PELLEGRINI:  That's correct.  It's not a

24    question -- biological is, at this point, descriptive of the

10:44 25    item.  It could actually be a pair of shoes with shoelaces that

1    Mr. Fick is wearing if he bought those shoes in Italy and he

2    was bringing them in.  There's an item that was never in the

3    United States before.  It's coming into the United States and

4    it needs to be declared.

10:44  5         Now what happens thereafter may depend on actually

6    what it turns out to be, but until, and if I understand the

7    regulatory scheme, that is the invoice, that is the

8    declaration, then until it's declared, nothing can be done

9    because we don't, Customs and Border Protection whose job it is

10:44 10   to determine what is coming into the United States doesn't know

11   that it's there.

12        THE COURT:  All right.  But here they found it.

13        MS. PELLEGRINI:  Here they found something.

14        THE COURT:  Right.

10:45 15        MS. PELLEGRINI:  Right?  And yet according to the

16   Agricultural Specialist, whose job is bio material, indicated

17   to the agent that it's biological.  It's Dr. Robert Boal also

18   indicated to, as I understand it, Agent Goldsworthy that it's

19   biological.

10:45 20        So the idea that it is biological but also doesn't

21   seem to be forced out of Ms. Petrova's mouth when she's

22   answering those questions, she defines it or calls it

23   biological.  She said she works in biology.  It's only logical

24   to assume that these items, which don't look like shoe leather,

10:45 25   which are in vials, liquid vials with little black dots on the

1    bottom and other types of paraffin look like biological items,

2    those needed to be declared so that whatever determination is

3    thereafter made, and no one's saying that if, in fact, they had

4    been properly declared and found to be not hazardous, not

10:46  5    toxic, made for research that they won't have been later on

6    allowed, but they're not going to be allowed when they're not

7    declared.

8         THE COURT:  But you're charging her with a crime of

9    smuggling.

10:46 10        MS. PELLEGRINI:  Yes, because --

11        THE COURT:  Which is a serious consequence.

12        MS. PELLEGRINI:  That is actually correct, but the

13    crime of smuggling seems to be -- I think that as Agent

14    Goldsworthy testified to and as the whole picture comes out to

10:46 15    be, Ms. Petrova is not an innocent who is simply waltzing

16    through Logan Airport unknown to her that she's carrying

17    biological materials in two different places:  In a backpack,

18    that means she carried it on the plane; and in her luggage,

19    which mean she carried it in cargo.  Those items are in two

10:47 20    different places.

21         Given the testimony regarding the information about

22    her travels, where she was, who she got the biological samples

23    from, which she was the only one who could answer that and she

24    did, which indicates it was an institute in Paris, then it's

10:47 25    only logical that she knew that those items were being brought

1    into the United States and they were biological.

2         Now whether she truly knew that they fit under

3    title -- I'm sorry -- CFR 49, 49 CFR, the section that Mr. Fick

4    is referring to, first of all, doesn't matter because, again,

10:47  5    the determination of that under that section still means

6    declaration.  It doesn't allow you to avoid the declaration

7    because you don't get to decide as the person, the conveyor

8    bringing those items into the United States, you don't get to

9    say, I looked at CFR 49, it says I have to do this and this.

10:48 10    And this, none of which was done, by the way, because they

11    weren't labeled in a way that anybody was able to determine

12    what they were, and then allow that -- simply allowed to come

13    into the United States.  That's not the way merchandise items,

14    anything that was obtained outside of the United States and is

10:48 15    now being brought in, in Agent Goldsworthy's words, for the

16    first time into the United States needs to be declared.  And

17    that is the crime we have charged her with.

18         MR. FICK:  Just very briefly.  I think the

19    government's conflating separate things.  There is a regulatory

10:48 20    requirement to declare items generally.  That's 19 CFR 148.11.

21    That says "All articles brought into the United States must be

22    declared".

23         The question of whether this is an article or

24    whatever, that's a very broad regulation for which there are

10:48 25    regulatory consequences.

1          The smuggling statute is different.  The smuggling

2    statute criminalizes the bringing in of merchandise and the

3    failure to invoice, not the failure to declare an item, the

4    failure -- it's the actual smuggling of merchandise.  It's very

10:49 5    specific, very different words.  That's a crime.

6          But the two things are not necessarily congruent.

7    I'll just leave it at that time.

8          THE COURT:  I'm going to take this under advisement.

9    Does either party want the opportunity to submit a brief?

10:49 10          MS. PELLEGRINI:  I do, your Honor, on the issue of the

11    elements for merchandise being invoiced.

12          THE COURT:  Yes.

13          MR. FICK:  And if I could then just respond I guess

14    within 5 days or something, that would be.

10:49 15          THE COURT:  Yes.  So want to do it by a week from

16    today?  Let's see.  What's today?

17          MS. PELLEGRINI:  Sure.

18          THE COURT:  And the following Tuesday, following

19    Wednesday?  What do you want, a week?

10:49 20          MR. FICK:  The following Wednesday is fine.

21          THE COURT:  Okay.  Thank you.

22          THE CLERK:  Court is in recess.

23          (Adjourned, 5:15 p.m.)

24

25

```
 1                    C E R T I F I C A T E

 2

 3

 4    UNITED STATES DISTRICT COURT )

 5    DISTRICT OF MASSACHUSETTS    )

 6

 7

 8          I, Kristin M. Kelley, certify that the foregoing

 9    transcript is a true and correct transcript of the

10    audio-recorded proceedings held in the above-entitled matter to

11    the best of my skill and ability.

12

13

14        /s/ Kristin M. Kelley             June 26, 2025

15        Kristin M. Kelley, RPR, CRR             Date
          Official Court Reporter
16

17

18

19

20

21

22

23

24

25
```